# Smith *v.* The State.

*Assault With Intent to Murder.*

(Decided April 8, 1913.    62 South. 575.)

1. *Names; Idem Sonans; Initials.*—The name "J. Van Smith" in an indictment is not idem sonans with "Javan J. Smith" as the initials are not regarded in considering a plea in abatement setting up misnomer.

2. *Assault With Intent to Murder; Principals and Accessories.* Under section 6219, Code 1907, in a prosecution for assault with intent to murder, it was necessary in order to convict the defendant for the act of his son, who fired the gun, to show that defendant was connected with the offense to such an extent as would render him a principal in the second degree, or an accessory before the fact, at the common law.

3. *Same.*—If a defendant was present actually or constructively, when his son fired the gun and aided or abetted him, or beforehand counselled or conspired with the son, but was absent when the shooting occurred, it would justify his conviction .of an assault with intent to murder, if the intent was there, and if not, of assault and battery, the son being guilty at least of the latter.

4. *Same; Evidence; Previous Threats and Quarrels.*—Evidence that the prosecutors were tenants of defendant and his son; that they had quarreled, that defendant learned that one of the tenants intended leaving and giving up his mules to the person from whom they were purchased, and said that the tenant should not leave until he had paid him and his son, that the night before the shooting defendant and son went to the tenant's house and threatened the family with physical violence, and that one of two persons fired at tenant and others as they were leaving, was admissible, in a prosecution for assault with intent to murder such tenants by the defendant and his son.

5. *Same; Threats; Acts of Prosecutor.*—Where the prosecution was for assault with intent to murder prosecutors, who were ten-

ants of defendant and his son, it was not competent to show that after threats made by defendant, that tenants would not be permitted to leave the farm without paying their debts, the tenants went after friends who came and sat up with them all the night before the shooting in anticipation of danger.

6. *Same; Intent; Evidence.*—In a prosecution for assault with intent to murder by shooting with a gun loaded with birdshot, it was competent for defendant to show the carrying distance of a gun of the kind used, its danger zone, and that it would not cause death or serious bodily harm at forty yards, which was less than the distance proven, as bearing on the intent.

7. *Same.*—If it would not be possible to kill a person with a shotgun at the distance which separated the assailant from the person assaulted, and the assailant knew of this impossibility, there could be no conviction of an assault with intent to murder, the intent being essential.

8. *Same.*—A person may be guilty of an assault with intent to murder if he had such intent at the time, although the means selected for its execution, and used in its attempt would not ordinarily accomplish the result intended, if the person was ignorant of this fact, and thought he was in fact employing means capable of executing his design.

9. *Same; Principals and Accessories; Instructions.*—Where the evidence tended to show that defendant's son did the shooting, and there was evidence of a conspiracy, a charge assuming that the actual firing of the gun by defendant was essential to a conviction, was properly refused.

10. *Conspiracy; What is.*—Criminally a conspiracy is a distinct substantive offense, complete when the corrupt agreement is entered into, though no act is done in pursuance of it.

11. *Same; Evidence.*—Evidence of an agreement need not be shown to prove a conspiracy, but it may be proven inferentially or by circumstantial evidence.

12. *Same.*—The acts, conduct and declaration of conspirators in promoting, or in relation to the purpose of conspiracy, may be given in evidence where there is other proof sufficient to show prima facie a conspiracy.

13. *Same; Question of Law.*—It is a matter for the court to determine when there is sufficient proof of conspiracy to admit in evidence acts and declarations of the conspirators.

14. *Same.*—A court will not be put in error for admitting in evidence the acts or declarations of conspirators without preliminary proof of the conspiracy, if sufficient prima facie proof of the conspiracy is brought out at any stage of the proceedings.

15. *Same; Sufficiency of Proof.*—The evidence examined and held sufficient as preliminary prima facie evidence of conspiracy to warrant the admission and declarations of the conspirators.

16. *Evidence; Conclusion.*—Where the witness did not recognize the persons doing the shooting, it was not competent for him to state that because of prior difficulties he judged it was defendant and his son.

[Smith v. The State.]

17. *Same; Opinion.*—Where a witness is shown to be qualified, he was competent to testify as to the carrying distance of a shotgun of the kind used, its danger zone, and that it would not cause death or serious bodily harm at a distance of forty yards, when loaded with bird shot.

18. *Same; Former Difficulty; Details.*—Where it is sought to hold a defendant as a conspirator with his son who did the shooting, it was competent to show all that defendant did or said in a previous difficulty, as tending to establish the conspiracy, although as a general rule, the details of former difficulties are not admissible.

19. *Witnesses; Qualification; Character.*—A witness on character must be able to state first that he knows the general character of defendant before stating whether it is good or bad, and from such knowledge may testify that he would not believe defendant on his oath in a court of justice either generally or in a case in which defendant is interested.

APPEAL from Clay County Court.

Heard before HON. E. J. GARRISON.

J. Van Smith was convicted of assault with intent to murder, and he appeals. Reversed and remanded.

The facts are sufficiently stated in the opinion. The following written charges were refused the defendant: (10) "The court charges the jury that, unless the defendant fired upon the parties in the wagon with the intention to murder some one by the shot, they cannot find the defendant guilty." (11) "The court charges the jury that they cannot find the defendant guilty unless they believe from the evidence beyond a reasonable doubt that he fired one of the shots testified to in the evidence." (12) "The court charges the jury that if they believe from the evidence beyond a reasonable doubt that Bud Smith, and not J. Van Smith, fired the shots they cannot find defendant guilty." (16) "The court charges the jury that, if the weapon used in this case was not a weapon ordinarily calculated to produce death at the distance from which it was fired, then defendant cannot be found guilty of assault with intent to murder." (34) "If it would not be possible to kill a person at the distance which separated the persons fired upon from

the assailant as sworn to in this case, then the defendant cannot be found guilty of assault with intent to murder."

BLACKWELL & AGEE, KNOX, ACKER, DIXON & STERNE, and R. G. ROWLAND, for appellant. The names were not idem sonans and the court was in error in sustaining demurrer to the plea in abatement.—*Gerrish v. State,* 53 Ala. 477; 21 A. & E. Enc. of Law 309. The fact that defendants had said something to the wife and daughter of Perry, was not admissible, as it is not charged that any assault was committed on them. Neither was it competent to show that because of these things, Perry went out and got a neighbor to sit up all night with him. It was incompetent for witness to testify that because of the former troubles, the witness was satisfied defendant did the shooting.—*Hardy v. Randle,* 173 Ala. 522; *Moore v. Maxwell,* 155 Ala. 302. Before the acts or declarations of conspirators are admissible, there must be sufficient preliminary prima facie proof of a conspiracy.—*Morris v. State,* 146 Ala. 89; 3 Enc. of Evi. 411. The court, therefore, erred in admitting the acts and declarations of the conspirators, as there was not sufficient proof to establish a conspiracy. Charge 10 should have been given.—*Elmore v. State,* 110 Ala. 65. Charge 14 should have been given.—*Jolly's Case,* 94 Ala. 20; *Jackson's Case,* 94 Ala. 90; *Williams v. State,* 77 Ala. 53; *Meredith v. State,* 60 Ala. 445; *Horn's Case,* 98 Ala. 30; *Clarrissa's Case,* 11 Ala. 57. On these same authorities, charges 16, 34 and 35 should have been given. Declarations made prior to the assault were not admissible. —*Langford v. State,* 130 Ala. 74. A witness shown to be familiar with the carrying capacity of a gun, its danger zone, and that it would not produce death or serious bodily harm at a certain distance when loaded

[Smith v. The State.]

with birdshot, is competent to testify to these facts.—
*People v. Lopez,* 135 Cal. 23.

R. C. BRICKELL, Attorney General, and W. L. MARTIN,
Assistant Attorney General, for the State. The plea
in abatement was subject to the demurrer interposed.—
*Diggs v. State,* 49 Ala. 311; *Pace v. State,* 69 Ala. 231;
*Underwood v. State,* 72 Ala. 270; *Kimbrell v. State,* 130
Ala. 40. The demurrer interposed by the state was
proper, the doctrine of idem sonans applying, and the
difference in pronunciation not being sufficient to sup-
port a plea of abatement.—*Block v. State,* 66 Ala. 493;
*Donnelly v. State,* 78 Ala. 453; *Rooks v. State,* 83 Ala.
76, 80; *Munkers v. State,* 87 Ala. 94, 96. It was not
error to admit the declaration of hostility on the part of
the defendant.—*Myers v. State,* 62 Ala. 599; *Hudson v.
State,* 61 Ala. 33; *Henderson v. State,* 70 Ala. 29; *Law-
rence v. State,* 84 Ala. 424; *Drake v. State,* 110 Ala. 9;
*Spragins v. State,* 139 Ala. 93. The allowance of evi-
dence to support the conspiracy charged by the State
was not improper. Separate and disconnected accounts
of the conspiracy in line with the common design, and
in furtherance of the conspiracy, may be given in evi-
dence against each and all of them.—*Bonner v. State,*
107 Ala. 97, 106; *Williams v. State,* 81 Ala. 1, 5; *John-
son v. State,* 87 Ala. 39, 42; *Hunter v. State,* 112 Ala.
77; *Crittendon v. State,* 134 Ala. 145, 153; *Collins v.
State,* 138 Ala. 57, 61; *West v. State,* 168 Ala. 1; *Boswell
v. State,* 1 Ala. App. 178, 181. The defendant's appear-
ance of anger was properly shown.—*Jenkins v. State,*
82 Ala. 25; *Prince v. State,* 100 Ala. 144, 147; *Hains-
worth v. State,* 136 Ala. 13, 18; *Miller v. State,* 107 Ala.
40, 43, 56. The statements of the defendant, as testi-
fied to by the witness Hamlin, were clearly admissible
as incriminating. The proper predicate was laid.—

*King v. State,* 40 Ala. 314, 319; *Steele v. State,* 83 Ala. 20, 25; *Dodson v. State,* 86 Ala. 60, 63; *Becham v. State,* 100 Ala. 15, 17; *Shields v. State,* 104 Ala. 35, 39; *Huffman v. State,* 130 Ala. 89, 91-2; *Bush v. State,* 136 Ala. 85, 88. The evidence sought to be adduced to prove the carrying power of the weapon used was not competent. "A loaded gun, discharged, or attempted to be discharged at another, within carrying distance is a deadly weapon, and unexplained, raises the presumption of malice aforethought."—*Crawford v. State,* 86 Ala. 16, 19; *Hadley v. State,* 55 Ala. 31. Herein the proof showed that the assaulted was struck with the shot from the gun that was fired; so the element of malice is presumed.—*Smith v. State,* 88 Ala. 23, 24; *Walls v. State,* 90 Ala. 618.

THOMAS, J.—The defendant was indicted under the name J. Van Smith, and he pleaded in abatement that his correct name was Javan J. Smith. The state demurred to the plea, which was sustained, on the ground, among others, that the name set up in the plea is idem sonans with that stated in the indictment.

In considering the plea we are to ignore the middle initial "J." given therein, since the criminal law regards a middle name as entirely immaterial.—*Rooks v. State,* 83 Ala. 80, 3 South. 720; *Pace v. State,* 69 Ala. 231, 44 Am. Rep. 513; *Kimbrell v. State,* 130 Ala. 40, 30 South. 454. So the plea in abatement can be properly regarded as alleging that the defendant's true name is Javan Smith, whereas he was indicted as J. Van Smith. Clearly the two sound alike, but when we treat the letter J, in the indictment, as only an initial of another name, which it purports only to be (*Diggs v. State,* 49 Ala. 311; *Gerrish v. State,* 53 Ala. 477), we have as the only given name of the defendant stated in

the indictment that of Van Smith, which is not idem sonans with that of Javan Smith given in the plea. The doctrine of idem sonans applies only to names that are spelled differently, but are pronounced alike, and was adopted for the reason that orthography provides no rule or standard for the correct spelling of proper names.. A person may spell his name as he pleases, and violate no rule of English; other persons may likewise spell it differently, and so long as it sounds the same the law will treat it as the same.—21 Am. & Eng. Ency. Law, p. 313 et seq.; *Rooks v. State,* 83 Ala. 80, 3 South. 720.

We find, however, nowhere such a statment or application of the doctrine of idem sonans as would warrant its extension to a case like this, and the reasons underlying the rule would forbid. If Javan Smith can be properly indicted as J. Van Smith, then Eurah Jones could be properly tried under an indictment against U. R. Jones, although the letters U. R. may be the real given name of another Jones actually intended to be indicted, or the initials of Uriah Rhodes Jones. The latter two instances are not cases of a different spelling of the same name, but a case of different names; and we are of opinion that the doctrine of idem sonans is not applicable to either instance.—*Gerrish v. State,* 53 Ala. 477.

At common law a person may be connected with a felony either as a principal in the first degree, as a principal in the second degree, or aider or abetter, as an accessory before the fact, or as an accessory after the fact. A principal in the first degree is he that is the actor or absolute perpetrator of the crime. A principal in the second degree is one who, at the time of the commission of the felony, is present, either actually or constructively—that is, either on the spot or near enough to render

assistance to the main design should the need arise—
and aids or abets in its commission in any way that these
words are defined in *Raiford v. State,* 59 Ala. 106; *Amos
v. State,* 83 Ala. 1, 3 South. 749, 3 Am. St. Rep. 682;
*State v. Tally,* 102 Ala. 63, 15 South. 722. An "acces-
sory" is one who is not the chief actor in the felonious
offense, nor present at its perpetration, but is in some
way concerned therein either before or after the act is
committed. If one be absent at the time a felony is
committed, yet procures, counsels, or commands another
to commit it, he is an accessory before the fact.—*Grif-
fith v. State,* 90 Ala. 583, 8 South. 812. If, knowing a
felony to have been committed, he receives, relieves, com-
forts, or assists the felon, he is an accessory after the
fact.—8 Am. & Eng. Ency. Law, p. 292; 1 Am. & Eng.
Ency. Law. p. 260.

This distinction and difference between the several of-
fenders was drawn at common law and applicable only
in cases of felony. In misdemeanors every person so
connected with the offense was treated as a principal
and could be indicted and tried as such—except that a
participation in the misdemeanor after the fact was
hardly noticed by the law.—1 Am. & Eng. Ency. Law,
p. 261, note 1. Section 6219 of the Code of Alabama
abolishes the distinction existing at common law be-
tween the several prime offenders in cases of felony, and
makes every person criminally connected with the act a
principal, as in misdemeanors, except accessories after
the fact. It declares: "The distinction between an ac-
cessory before the fact and a principal, and between
principals in the first and second degrees in cases of
felony, is abolished; and all persons concerned in the
commission of a felony, whether they directly commit
the act constituting the offense, or aid or abet in its
commission, though not present, must hereafter be in-

dicted, tried, and punished as principals, as in the case of misdemeanors." Accessories after the fact are dealt with in section 6220.

The defendant, J. Van Smith, and his son, Bud Smith, were in pursuance of the statute separately indicted and tried as principals for an assault with intent to murder John Perry, Mrs. E. F. Perry, Henry Wilkes, and Ernest McCarley—all of them in one count and each of them in separate counts. Bud Smith was first tried and convicted, and it is contended by the state, which is admitted by defendant, that Bud Smith is the person who actually fired the gun in the alleged assault. In order, therefore, to convict the defendant for the act of Bud Smith, whether it amounted to only an assault and battery or the graver offense of an assault with the intent to murder, it must be established that the defendant was connected with the offense to such an extent as would make him either what was known at common law as a principal in the second degree or an accessory before the fact, each of which terms has been hereinbefore defined.

It was therefore competent for the state to offer evidence tending to show either or both, and if the jury believed either beyond a reasonable doubt—either that he was present, actually or constructively, at the time Bud Smith fired the gun, and aided or abetted him in the doing of the act (*Raiford v. State*, 59 Ala. 106; *Amos v. State*, 83 Ala. 1, 3 South. 749, 3 Am. St. Rep. 682; *State v. Tally*, 102 Ala. 63, 15 South. 722), or, if absent at the time, that he beforehand had procured or counseled or conspired with Bud Smith to do the act (*Griffith v. State*, 90 Ala. 583, 8 South. 812; *Hughes v. State*, 75 Ala. 31)—they would be justified in convicting him, of an assault with the intent to murder, if the jury further believed beyond a reasonable doubt that there was

such an intent (*McCormack v. State,* 102 Ala. 156, 15 South. 438; *Meredith v. State,* 60 Ala. 441), and, if not, of an assault and battery, since there is no question but what Bud Smith was guilty of at least the latter.

A "conspiracy" in general is defined to be "the confederating together of two or more persons to accomplish some unlawful purpose, or a lawful purpose by unlawful means."—2 Bish. New Crim. Law, §§ 171, 175; 6 Am. & Eng. Ency. Law, p. 832; 1 Mayf. Dig. p. 214. Sections 6470 and 6471 of the Code, respectively, fix the punishment for criminal conspiracies to commit felonies and misdemeanors. A criminal conspiracy is a distinct, substantive offense, complete when the corrupt agreement is entered into. Such agreement is the very gist of the offense, and it is not necessary to a conviction for a conspiracy alone that any act should be done in pursuance of it.—*Thompson v. State,* 106 Ala. 76, 17 South. 512. When an act, however, has been committed by one of the conspirators in furtherance of the common design, if the act amounts only to a misdemeanor, then all of the conspirators may be indicted and tried either for the conspiracy to commit the act or for the act itself; but, when the act done in such furtherance amounts to a felony, then the lesser offense of the conspiracy to do the act is merged into the higher crime of the act itself and the conspirators can only be indicted for and convicted of the latter—all as principals under the statute. —6 Am. & Eng. Ency. Law, p. 863. The rules of evidence, however, applicable to the establishment of a conspiracy, are the same, of course, whether the parties are charged and being tried for the conspiracy itself or for the crime committed in execution or attempted execution of it.

It has been repeatedly held that it is not necessary, in order that the fact of the conspiracy may be established,

that it should be proved by evidence of an express agreement or compact between the alleged conspirators, or by direct evidence of any agreement or compact; but that it may be proved inferentially, or by circumstantial evidence. Conspiracies from their very nature are usually entered into in secret, and are consequently difficult to be reached by positive testimony, which renders it peculiarly necessary and proper to permit them to be inferred from circumstances.—*Morris v. State*, 146 Ala. 88, 41 South. 274. Nor need it be shown that there was a prearrangement to do the specific wrong complained of.—*Pierson v. State*, 99 Ala. 152, 13 South. 550.

The acts, declarations, and conduct of each conspirator in promotion or in relation to the object or purpose of the conspiracy, being considered in law as the acts, declarations, or conduct of each co-conspirator, may be given in evidence against him; but in order to justify the admission of such evidence by the court there must be proof aliude sufficient to show prima facie a conspiracy, which is for the court to determine.—*McAnally v. State*, 74 Ala. 16. When this has been determined in favor of the state, and the evidence mentioned is admitted, it then, of course, becomes a question for the jury to finally decide from all the evidence—these acts, declarations, and conduct of the conspirators coupled with the evidence aliunde—whether or not the conspiracy alleged in fact existed. Their verdict, so finding, is, of course, beyond our province to review. We can only determine on proper objection and exception whether the court erred in admitting the evidence of the acts, declarations, and conduct of the alleged co-conspirators, which rests solely upon the question as to whether or not the evidence independent of such acts and declarations warranted an inference of the conspiracy.

[Smith v. The State.]

We are of opinion that it all taken and considered together does in this case; and that the court properly admitted proof of the separate acts of Bud Smith. And while the general rule is that such evidence aliunde— a sufficient amount at least to show prima facie a conspiracy—should precede in the order of proof the acts. declarations, and conduct of the co-conspirator; yet we do not regard this as an ironclad rule, but are of opinion that it, fixing the mere order for the introduction of evidence, was established for the purpose rather of expediting the business and saving the valuable time of the trial court than of protecting or securing any supposed right the defendant might have. If there is no evidence aliunde sufficient to show prima facie the conspiracy, it should be known in the early stage of the trial, that the court may then put an end to the case and proceed to other business, without the useless consumption of its time in hearing evidence of acts or declarations of a co-conspirator, which must in the end be excluded in the absence of such other evidence. If, on the other hand, there is such evidence aliunde and it is brought out at any stage of the trial, the court will not be put in error for having previously during the trial admitted out of the usual order evidence of the acts and declarations of a co-conspirator, for the reason that as a final result the defendant has suffered no injury. We quote with entire approval the following, from the Supreme Court of Michigan: "The proper order of proof in cases of conspiracy is first to give evidence of the unlawful combination, and afterwards to show the acts and declarations of the conspirators in pursuance thereof, or in some manner to connect them severally therewith. But it often happens that the existence of the conspiracy is only made out by inference from the facts and declarations of the several parties thereto; and to

exclude evidence of these until the conspiracy is estab-
lished in some other way would, in many cases, give the
guilty parties immunity.   There is no class of cases in
which it is more important that the circuit judge should
have a large discretion as to the order in which evidence
should be received, and this discretion cannot be review-
ed on error except in clear cases of abuse.   The opening
of the case by the prosecution and any further explana-
tion that may be called for will generally enable the
judge to exercise his discretion in such manner as, while
not shutting out proper evidence, shall at the same time
protect the accused from being prejudiced by testimony
which, in the end, shall prove irrelevant, or not legally
competent to charge the party on trial.   And whenever
facts are proved which depend upon other facts to give
them a bearing upon the guilt of the accused, if such
other facts are not put in, the court may at the conclu-
sion of the trial exclude the evidence."—*People v. Saun-
ders,* 25 Mich. 119; 3 Ency. Ev. 425.

There are so many objections and exceptions by de-
fendant in the present case to the introduction of evi-
dence—many of which are without merit and some of
which are of sufficient merit to necessitate a reversal—
that we can best dispose of them all by first setting out
in a general way those facts, which the evidence for the
state tended to establish, which we think material, to
wit:   That early on a Monday morning in June, about
daybreak, the parties assailed, to wit, John Perry, Mrs.
E. F. Perry, Henry Wilkes, and Ernest McCarley, were
riding in a wagon across a field rented by the former,
said John Perry, from defendant and Bud Smith, de-
fendant's said son, en route to Lineville, Ala., from the
former's home, which was on a part of the said land so
rented.   That Mrs. E. F. Perry was said John Perry's
mother and resided with him, and Henry Wilkes and

Ernest McCarley, the other two persons in the wagon, were neighbors, who had spent the night before at his house. That just after the wagon had crossed the field and passed into the road and crossed a little bridge, spanning a ditch or branch, not far from Bud Smith's barn and about 200 yards from John Perry's house, the parties in the wagon were fired at twice with a shotgun in the hands of a person in the field by the ditch some 40, 50, or 60 yards distant, near whom was standing another person. That the person doing the shooting was recognized by some of the occupants of the wagon as Bud Smith, though none of them were able to identify his companion. That defendant and Bud Smith were father and son and landlords of said John Perry, and they lived only about half or three quarters of a mile apart, and John Perry lived from 160 to 200 yards south of Bud Smith's. That in the early morning about the time of the shooting the defendant was seen by others going across a field towards his house in a fast walk from the direction of the shooting and subsequently entering the back door of his house upon reaching it. That there were two sets of tracks at the place where the person stood who did the shooting. That on Friday before the shooting on Monday the defendant and his said son, Bud Smith, had a falling out with their tenant, John Perry. That following this, on Sunday before the shooting the defendant passed the house of another one of his tenants, witness E. M. McCarley, father of the McCarley who was in the wagon at the time of the shooting, and requested him to see John Perry for him. That witness saw Perry, and later in the same afternoon defendant returned and ascertained from witness what Perry had said. That this was to the effect that Perry said "it was too late; that defendant had refused to furnish him on the Friday before, and it was too late now;

that he was going to Lineville the next day, Monday, to see about giving up his mules to the man from whom they were purchased." That defendant then said he did not want Perry to leave and that he should not leave until he gave satisfaction for the debt he owed him for the corn he let him have, which was then in John Perry's crib, that he would have to return it or pay for it and make satisfaction to Bud Smith about the mules—the latter being a surety on the note for the mules—and that defendant wanted Perry to turn the mules over to Bud Smith. That defendant appeared to be angry and from witness' house he went direct to Bud Smith's house. That later in the same evening, Sunday afternoon about sundown, the two appeared at the lot, where Perry's wife was out milking her cow. That the defendant asked her "what had got the matter with John," and that upon her reply that it was "a right smart," that defendant had quit furnishing him, the defendant said that he could prove that John had a sack of flour and a middle of meat hidden out, etc. That, hearing the quarreling, Mrs. E. F. Perry, John Perry's mother, went down to the lot where her daughter-in-law and the said Smiths were, whereupon defendant jumped down off the fence, where he was sitting, and made towards her with a knife in his hand and angrily said, in effect: "You all shall not take a d—— thing off this place until John pays me what he owes me. * * * You all have got to get out of that house to-night, and I'm not afraid to put you out by myself; but I'll be —— if I don't lose my heart's blood before you shall take a thing out of that house until John pays me what he owes me." That witness told him she was going to have her own things, which she could prove, but defendant said she was not to move a —— thing out of that house until John paid him. That Bud Smith

was present during all of this time, having gone there
with defendant; and that after this altercation with the
women the two, defendant and Bud, left the lot and
went on off up the road together about night or nearly
dark.  That about 2 or 3 o'clock that night, or about an
hour before John Perry and the others mentioned left
in the wagon for Lineville early Monday morning.  Bud
Smith was seen with a gun hiding in Perry's back yard,
and ran and disappeared upon being discovered.  That
from John Perry's house there are two roads leading
to Lineville—each running in sight of either the house
of Bud Smith or that of defendant—and which are the
ones usually traveled; but that John Perry with the
others in the wagon on the morning of the shooting took
neither of these roads, but went across the field; and
upon reaching the place, hereinbefore mentioned, the
parties in the wagon were fired at twice by Bud Smith,
as before detailed.  That by him was standing another
unrecognized party.  That two sets of tracks were after-
wards found there, and the direction in which
they led, but nothing to indicate whose they were,
or any peculiarities.  The evidence tending to establish
the facts we have detailed was properly admitted.  It
was also proper to show any confessions made by de-
fendant, or any of the acts and declarations of Bud
Smith connecting himself with the offense; since we are
of opinion there is sufficient evidence, outside of the
separate acts of Bud Smith, to show prima facie a con-
spiracy.  If defendant was present aiding or abetting
Bud Smith, who is confessedly guilty of doing the shoot-
ing, then defendant is guilty.  If defendant was not
present at the time, he is still guilty if he previously
counseled with Bud Smith to do the act, or counseled or
conspired with Bud Smith to unlawfully prevent by
force John Perry or his family from taking anything
of their own off the premises when they left, or from

[Smith v. The State.]

leaving until Perry had given satisfaction for the corn or mules, and Bud Smith did the shooting in execution or attempted execution of this conspiracy.—*Bridges v. State,* 110 Ala. 18, 20 South. 348. *Pierson v. State,* 99 Ala. 152, 13 South. 550.

The court should not have permitted the evidence to the effect that, after the Sunday evening quarrel and alleged threats then made by defendant, John Perry went off and got some of his neighbors to spend the night at his house, and that they and his family and self sat up there together all night watching for the Smiths. These matters were res inter alios acta and were not admissible even for the purpose for which they were used, that of bolstering up the testimony of John Perry to the effect that violent threats had been made by the Smiths to come into his house that night. A witness is not permitted to make testimony to bear out and substantiate a statement of his as to what had previously occurred. These neighbors might testify as to any material fact occurring at John Perry's house that night, and, if defendant questioned their presence, he might on cross-examination ascertain why they were there and why they were up at the unusual hour.

It was likewise error to permit the witness Ernest McCarley to state that in his judgment the parties who did the shooting were Bud Smith and the defendant, since he stated positively that he did not recognize either of the parties, but concluded or judged that it was the Smiths named from the fact of the previous trouble between them, himself, and John Perry.

After the defendant became a witness in his own behalf, or after he offered evidence of his good character, it was proper for the state, of course, to assail his character, which was done. If, however, in the examination of the witnesses on the coming trial, the usual formula

of questioning in this particular be followed, it will avoid the objections and exceptions now urged by defendant. A character witness, to be competent as such, must first be able to state that he knows the general character of the defendant in the community in which he lives; then whether it is good or bad. If bad, then, if it be desired to impeach defendant's veracity, the witness may testify that from his general knowledge of that character he would not believe the defendant on his oath in a court of justice; either generally, or the witness may, as in this case, limit it to a case or matter where and iu which defendant is interested.

As a general rule, in cases of assault, assault and battery, assault with intent to murder, or homicide, while it is always permissible to show the fact that there had been a previous difficulty between the parties in order to establish a motive for the act in question, yet the law of evidence forbids the details being given in such trials, because they are immaterial. But when, as in this case, a conspiracy is sought to be established in order to hold defendant responsible for the act of another party, Bud Smith, who did the shooting, it is highly essential, we think, to show all the defendant said in the Sunday afternoon quarrel between him and some of the parties, when Bud Smith was present, and all he said shortly before to witness McCarley, from whose place, immediately afterwards, defendant went direct to Bud Smith's house. These details were material in tending to establish against defendant the fact that there was a conspiracy.

The evidence is without conflict that the gun, which was fired at the persons in the wagon, was loaded with only bird shot, which did not penetrate the skin and produced only slight wounds. The evidence as to the distance the person who did the shooting was standing at

the time is conflicting; the state's witnesses putting it, one, upon estimate, at 40, 50 or 60 yards, and the other at 63 steps, which he says he ascertained from actual subsequent measurement, while those for defendant put it at about 125 yards. We are of opinion that under the facts detailed it was competent for the defendant to show the carrying distance of a gun of the kind used, its danger zone, and that its carrying power, as the gun used was charged and loaded, was insufficient under any circumstances to produce death or serious bodily harm at a distance of 40 yards. The opinions of witnesses as to these matters are competent, provided the witnesses are first shown to be sufficiently qualified by experience and general or special knowledge of the subject to give an opinion.

The court should have given the following charge requested by defendant: "If it would not be possible to kill a person with a shotgun at the distance which separated the assailant from the persons assaulted, as sworn to in this case, and the assailant knew of the impossibility, there cannot be a conviction of an assault with intent to murder."—*Williams v. State,* 77 Ala. 53; *Meredith v. State,* 60 Ala. 445; 50 Ala. 119; 78 Ala. 154; *Hall v. Posey,* 79 Ala. 84; *B. R. L. & P. Co. v. Lee,* 153 Ala. 391, 45 South. 164; *Duncan v. Railroad Co.,* 152 Ala. 118, 44 South. 418; *Mansfield v. Morgan,* 140 Ala. 567, 37 South. 393. An intent to murder is an essential ingredient of the crime denominated in section 6309 of the Code as "an assault with the intent to murder."— *McCormack v. State,* 102 Ala. 157, 15 South. 438; *Walls v. State,* 90 Ala. 618, 8 South. 680. An intent is a state of the mind and not susceptible of direct or positive proof. Upon the theory that every rational being acts and speaks alone from motive or by direction of the mind, we ascertain circumstantially his mental status

behind the particular act or speech by using the latter as its interpreter. Hence the law presumes that every person intends the natural consequences of his acts. The negative of the proposition is equally true. Hence, if the jury believed that it was impossible for an act of the kind complained of in this case to result in death, and that it did not do so and that the person doing the act knew at the time it could not do so, then the person doing the act, as well as his confederates, are entitled to an acquittal of assault with intent to murder, because the facts detailed negatived conclusively an intent to murder.

Written charges 10, 11, and 12 were properly refused. Each is an incorrect statement of the law, as applied to some tendencies of the evidence, in that it assumes that the actual firing of the gun by defendant was necessary to make him guilty.

Charges 16 and 34 were properly refused. The law is contrary to the statement contained in each of those charges. A person may be guilty of assault with the intent to murder, if the jury believe he had such intent at the time, although the means selected for its execution and used in its attempted execution would not ordinarily accomplish the result intended; provided the person was ignorant of this fact and thought he was in fact employing means capable of executing his design.— *People v. Lee Kong,* 95 Cal. 666, 30 Pac. 800, 17 L. R. A. 627, 29 Am. St. Rep. 165; *Christian v. State,* 133 Ala. 109, 32 South. 64. It is the criminal intent, followed by an attempt to execute, which the law punishes. If the means chosen are not adapted to the end, it furnishes a strong but not conclusive inference that there was no such intent. If, on the other hand, he at the time had knowledge of their impotency, the case is different and the conclusion irresistible that he had no intent to

[Johnson v. The State.]

murder. The case of *State v. Clarissa,* 11 Ala. 57, is not authority for the charge. That was a charge "of *attempt* to poison" and not of *"intent* to poison," and the court there properly held that there could be no conviction unless the concoction administered was actually a poison. If it was not, although the person administering it thought it was, there could be no conviction of an "attempt to poison," though there might of an "intent," if the law inhibited it.

What we have said in a general way herein sufficiently indicates our view of the numerous other assignments of error—some 50—to relieve the necessity of considering them in detail.

The judgment of conviction is reversed, and the cause remanded.

Reversed and remanded.