James Alvin Inzer was indicted on June 19, 1981, under a three count indictment charging this appellant with the capital offense of murder, when the killing was done for a pecuniary or other valuable consideration or pursuant to a contract or for hire. Alabama Code § 13-11-2 (a)(7) (1975). After a three day trial, commencing on April 19, 1982, the jury found appellant guilty of the lesser included offense of murder. A sentencing hearing was held, at which time appellant was sentenced to life imprisonment. From that conviction he now appeals.
Around 9:00 p.m. on March 21, 1981, Trussville police officer Louis Johnson received a radio dispatch to proceed to the scene of a one vehicle accident on Interstate 59 about three miles north of Trussville. He observed a red colored truck *Page 841 
resting against a tree in the median dividing the interstate. Johnson noticed the severe damage to the front of the truck and observed the driver, later identified as James Taylor. The victim had suffered massive head injuries. Johnson checked the victim for signs of life and found none. He secured the scene until the arrival of Alabama State Trooper Eugene Melton, to which he relinquished control.
Hoyt Taylor, brother of the victim, stated that he last saw the victim alive on March 17, 1981. On March 24 he saw his brother reposed at the funeral home. Taylor noted that his brother had been a postman for about ten years and owned a red Toyota pickup truck, a photograph of which he identified. He was married to Susan Taylor and had two children. He identified a photograph of her. Taylor stated that appellant was his and the victim's cousin. Appellant lived about one-quarter mile from the victim.
Alabama State Trooper Eugene Melton arrived on the scene of the apparent automobile accident around 9:30 p.m. He made a diagram of the scene, noting the distances of glass, debris, and skidmarks from the 138 mile post marker to the resting place of the truck. The diagram was introduced into evidence. Melton observed the appearance of the victim and did not detect the presence of alcohol in or around the truck or the victim.
On March 22, Dr. Charles Alexander performed an autopsy upon the body of the victim. Initially, Dr. Alexander was under the impression that the victim had been involved in an automobile accident. However, after having examined x-rays of the victim's head wound, the character of his examination changed to that of possible homicide. Dr. Alexander removed fifteen shotgun pellets from the victim's head injury and turned them over to Jefferson County deputy coroner Charles Robey. Dr. Alexander determined the cause of death to be a shotgun wound to the head.
Deputy Coroner Charles Robey participated in the investigation of the death of the victim and his autopsy. Robey had the victim's body transported to Cooper Green Hospital where he observed Dr. Alexander perform the autopsy. He received from Dr. Alexander the victim's clothing, glass fragments removed from the wound, a sample of head hair, and two envelopes containing shotgun pellets. He turned the pellets over to the Department of Forensic Sciences criminalist Lawden Yates.
On March 22, Alabama Bureau of Investigation investigator Marvin Roye became involved in the investigation of the victim's death. Initially, he inspected the victim's truck and removed numerous samples of green paint embedded into the damaged left side of the truck. He turned the samples over to Yates. On March 24, Roye returned to the site of the truck, took several more paint samples and turned them over to the Department of Forensic Sciences criminalist Wayne Burrow. Roye noted two indentions on the upper left hand side of the truck near the driver's seat.
After inspecting the truck, Roye traveled to Interstate 59 where the victim was found and searched the general area for additional evidence. Roye found some shotgun waddings on the side of the Interstate just prior to the area where the victim's truck had come to rest. They were turned over to Yates. On April 1, Roye returned to the scene and after re-examining the area, found a sawed-off pump shotgun between twenty-five to fifty feet past the point at which the victim's truck had come to rest. The shotgun was in a "jammed" condition when found. He delivered it on the same day to Yates.
Also on April 1, Roye participated in the arrest of co-conspirator Danny Ray Williams[1] at Williams' Tarrant City residence. Seized at that time was Williams' automobile, a green Plymouth Valiant. He turned the vehicle over to Yates. Roye stated that co-conspirator Walter "Red" Hunt was also arrested on April 1. Roye saw both suspects that evening at the state trooper's headquarters. Roye talked to Hunt and *Page 842 
seized an address book from him. Several officers involved in the investigation examined the book, after which Roye turned it over to Trussville police investigator Don Emerson.
Criminalist Lawden Yates testified to his receipt and examination of several items of evidence gathered in the instant case. He did not test any of the paint samples received by him, but rather turned them over to Wayne Burrow. Yates did examine the victim's truck and Williams' car and found scratched and abraded areas on the left and right side of each vehicle, respectively. He could not determine, however, whether they were caused by the vehicles' impact into each other. Nevertheless, Yates noted that the marks on each vehicle were approximately the same distance from the ground.
Yates examined the wadding found near the scene and determined it to be consistent with that found in twelve gauge shotgun shells. The sawed-off shotgun was a twelve gauge shotgun containing two twelve gauge double 00 buckshot shells. It had an amount of green paint on the forestock which Yates removed and turned over to Burrow. Yates examined the wadding of one of the shells and found its wadding consistent with that found at the scene. The pellets removed from the victim were judged to be size single 0 gunshot or larger and could have been fired from the shotgun. Yates stated that the indentions located on the upper left hand side of the truck near the driver's seat were consistent with being produced by wadding material common to a twelve gauge shotgun shell.
Trace evidence analyst Wayne Burrow testified that he examined the several paint samples submitted with paint he had removed from Williams' car. He determined that the green paint found on the victim's truck and on the shotgun was the same as that on Williams' car.
Shortly after 8:00 p.m. on March 21, 1981, Jefferson County Deputy Sheriff Tommy Stewart was on patrol in the general vicinity of the instant killing when he received a radio dispatch to proceed to the scene of an unrelated automobile accident. The order was subsequently cancelled, but Stewart had proceeded to a convenience store on Swinney Hollow Road, located about two miles from Interstate 59 and three quarters of a mile from the victim's home. There he observed a green Plymouth Valiant which he mistook as belonging to a former college roommate. He pulled into the parking lot and parked alongside the driver's side of the car. There he observed two males whom he identified as Williams and Hunt. Stewart stated that Hunt was apparently the driver of the car and Williams was seated in the front passenger's seat. Upon discovering the mistake, Stewart left. About forty-five minutes to one hour later, Stewart heard a radio dispatch concerning the victim's apparent accident.
Joseph Bagwell testified that he and appellant had known each other for eight years and were both employed at Connor's Steel Company. From the first week of January, 1981, to the first week of February, 1981, Bagwell lived with appellant at his Pinson residence. During the previous months of October, November, and December, appellant had inquired of Bagwell as to whether he knew anyone "that would take a contract on somebody to have somebody killed." (R. 288) Bagwell replied that he ". . . really didn't know. You know, at the time I thought I knew somebody. It never did materialize." (R. 288) Appellant never mentioned the name of the person he wanted "to get rid of." (R. 289)
Approximately one month later, appellant asked Bagwell "if [he] had found anybody for him." (R. 289) Later, while living at appellant's home, appellant informed Bagwell that "he [had] found somebody to do the job for him." (R. 290) Appellant told Bagwell that he was going with his cousin's wife, Sue, whom Bagwell later met and determined to be the victim's wife, Susan Taylor, and that "he wanted to get rid of this guy, this girl's husband." (R. 290) Appellant stated that the Taylors lived a couple of blocks from his home. *Page 843 
During the middle of January, 1981, Mrs. Taylor came to appellant's house to see him. Bagwell answered the door and invited her in. Mrs. Taylor introduced herself and then proceeded to appellant's bedroom, where he was asleep. Mrs. Taylor awakened appellant and remained in the bedroom for a few minutes then, after kissing appellant, left. Bagwell stated that appellant and Mrs. Taylor "had an arrangement where she came over there every morning. She hadn't been coming while I was staying there." (R. 292)
On cross-examination, Bagwell admitted having a prior conviction for violating the Controlled Substances Act. Appellant attempted to illustrate inconsistencies in Bagwell's testimony and his previous statements made to the police.
Trussville police investigator Don Emerson testified that on April 1, he was present when Williams was arrested and later saw Williams and Hunt at the state trooper headquarters. Emerson received from Roye the address book taken from Hunt.
On voir dire examination outside the presence of the jury, Emerson testified that around 10:30 p.m. on April 1, he saw appellant at the Alabama Bureau of Investigation (ABI) office. Emerson interviewed appellant in the presence of ABI Captain Davis. Emerson stated that he read appellant his Miranda
warnings and asked if he understood them, to which appellant, after reading them himself, affirmatively replied. His testimony established the proper voluntariness predicate. Emerson asked appellant to sign a waiver of rights form, to which appellant replied that "he understood the rights but . . . refused to sign . . . on the advise (sic) of his attorney." (R. 315) Nevertheless, upon asking appellant whether he wished to make a statement, appellant stated although "his lawyer [had] advised him not to sign any papers," that "Yeah, I'll talk to you about it." (R. 319) Appellant made no request to call anyone.
Emerson then asked appellant if he knew Williams to which he negatively replied. He inquired of his relationship with Hunt, to which appellant stated that "he knew of Red Hunt" (R. 316) and had talked to him once about some carpet work, but had not talked to or seen him in over a year. Emerson also asked appellant to tell of his involvement in the murder of the victim. Appellant replied that "he wouldn't make any statement until he talked to his attorney." (R. 316) At that point Emerson ceased his interrogation.
Emerson stated that he had also interviewed appellant on March 23 or 24 at a time when there were no known suspects to the killing. During the course of the interview appellant told Emerson that he, Mrs. Taylor, and their children had gone to Florida during the AEA school vacation.
The trial court ruled that the above statements were admissible except for the part concerning appellant's involvement in the victim's death. Upon resumption of the trial, Emerson reiterated the substance of the above testimony to the jury.
Kim McCain testified that around November, 1980, he was employed by Hunt as a carpet layer. He also knew Williams. During November, Hunt approached McCain at the carpet shop and told him that a woman and her boyfriend wanted to kill her husband, whom Hunt identified as the victim. Hunt asked McCain if he would do it, to which he agreed. Hunt told McCain that he would supply him with a photograph of the victim and information about him which Hunt would receive from Mrs. Taylor. The next day Hunt delivered the information to McCain and told him to go to a bowling alley in Pinson to observe the victim. McCain followed Hunt's instructions. Subsequent thereto, Hunt informed McCain that he would be paid, by the wife and boyfriend, $1,500 for killing the victim and if such was done by Christmas 1980, he would receive a $200 bonus. McCain never took any action which prompted Hunt to inquire of him several times as to where he was going to kill the victim and why it was taking so long. Hunt informed McCain that if he did not "do the job" (R. 338) then the boyfriend would get two former Vietnam war comrades *Page 844 
to do it. Hunt also told him that he had returned the $1,500 to the boyfriend, but had it in his possession once again as the plans to hire the two war comrades did not materialize. In December, after being informed of the above, McCain declined to carry out the killing.
About one or two months later, Hunt told McCain that the woman who wanted her husband killed was Susan Taylor and her boyfriend was appellant, the victim's cousin.
Shortly before Christmas, 1980, McCain introduced Hunt to Williams. In January or February, 1981, he had a conversation with Williams wherein Williams informed him that Mrs. Taylor wanted Hunt and him to follow her husband to Tuscaloosa, where he was going fishing, and kill him. Around the time of the AEA school vacation Williams told McCain that Mrs. Taylor had told him that she would be in Florida during the school vacation and that she would leave the back door to her house unlocked so that Williams could gain access, pose as a burglar, and kill her husband. During this period of time McCain saw Williams in possession of the sawed off shotgun found in the area where the victim was killed and the green Plymouth Valiant. Williams told him that Hunt had bought both items for him. While examining the shotgun, McCain asked Williams to put it up, to which Williams replied, "I want to do it bigtime." (R. 341)
The morning after the victim's death, McCain saw Williams at Johnny Pennington's house. At that time Williams took from his pocket fourteen $100 bills and five $20 bills.
On cross-examination, McCain admitted that the state had made an agreement concerning a pending burglary charge against him in exchange for his testimony.
The state recalled Trussville police investigator Don Emerson who identified the address book taken from Hunt by Roye. Contained inside the book was the name and address of Williams and the name, address, and telephone number of appellant. The book was admitted into evidence.
Emerson testified that upon the arrest of Williams on April 1, he seized an address book from him. Contained therein was Hunt's name and several telephone numbers, one being 833-8018. This book was also admitted into evidence.
After having talked to appellant and within forty-eight hours of Hunt's arrest, Emerson executed a search warrant at Hunt's carpet shop in Woodlawn. Emerson seized several documents and papers found "in the vicinity of the desk where the telephone was located toward the rear of the building." (R. 353) Emerson identified the documents seized.
Jeanette House testified that during the period of October through December 1980, she was employed by Hunt at his carpet shop as a salesperson. She also took telephone messages for Hunt when he was away from the shop. House stated that during the above period of time, she took several messages from appellant to Hunt. House stated that she dated a message pad sheet daily and then wrote any messages received for Hunt on that day on the corresponding dated sheet of the pad. On October 4 and December 22, 1980, House took messages from appellant to Hunt. The October 4 message was simply, "that Inzer called," (R. 363) while the December 22 message stated, "James Inzer, 854-3805. Call him, Red." (R. 362) Both message sheets were part of those previously seized by Emerson. The message sheets were admitted into evidence.
Christy Pennington, wife of John Pennington, stated that about one week prior to the victim's death, Williams was introduced to her by McCain. Immediately prior to the March 21 killing, Pennington was privy to a conversation at her house between Williams and her husband. Williams told the Penningtons that a woman and her boyfriend wanted her husband killed in order to collect the proceeds of his insurance policy. Williams stated that the boyfriend was the husband's cousin. Williams was to be paid $1,500 and had been supplied with a car and a shotgun by Hunt. Pennington *Page 845 
observed the car, a dark green Plymouth Valiant.
On the morning of the fatal incident, Hunt visited Williams at the Pennington residence as Williams had spent the night there. The two had a conversation on the front porch to which Pennington was not privy. Sometime prior to Williams leaving, the Penningtons had another conversation with Williams during which they implored him to disassociate himself with the plan to kill the victim. Between 7:00 and 8:00 p.m. on March 21, Williams left the Pennington residence in the Valiant.
David House, former husband of Jeanette House, testified that during the months of October through December, 1980, he was employed by Hunt as a carpet layer. During the above period of time, Hunt told him about the situation involving appellant and Mrs. Taylor and the plan to kill her husband for the proceeds of his insurance policy. Hunt used the names of appellant and Mrs. Taylor and asked House if he knew of anyone that would kill the victim. From October, 1980 to February, 1981, Hunt asked House ten to twenty times about such.
Around Christmas, 1980, House saw appellant at the carpet shop. House stated that appellant drove up in a four-wheel drive truck and Hunt told him, "That's Inzer. I need to talk to him." (R. 381) Appellant entered the shop, and he and Hunt went to the other side of it and talked.
Ralph Hammett, business office manager of the Village East branch of South Central Bell Telephone Company verified from his records that in March, 1981, the telephone number 833-8018 was registered to Hunt.
Donald Stewart, a fellow employee of appellant's at Connor's Steel, stated that during the months of October through December 1980, he and appellant had several conversations about appellant's girlfriend, whom appellant said was married. Stewart stated that appellant did not mention any names.
Jimmy Walker, a neighbor of the victim who lived a couple of houses down from him, testified that he knew the victim, his wife, and appellant. Walker stated that during the victim's working hours he saw, on several occasions, appellant visit Mrs. Taylor. Walker observed the visits over a period of months with such occurring three to four times a week. On many occasions, appellant would stay at the Taylor residence until around 1:30 p.m.
Clinton Whittaker, a fellow employee of appellant, stated that several times during October 1980 through January 1981, he and appellant hunted several times at a hunting club they belonged to. During the above time frame, appellant told Whittaker that he was in love with Mrs. Taylor, wanted to marry her, and did not know why she and the victim did not get a divorce. Whittaker testified that sometime after January, 1981, appellant was involved in an automobile accident and during his recovery he visited him at Mrs. Taylor's house.
About one week after the victim's death, appellant told Whittaker about his trip to Florida with Mrs. Taylor during the AEA school vacation. He told Whittaker that during the trip, he and Mrs. Taylor slept together. Due to the many rumors circulating, Whittaker asked appellant if he had called Hunt from Florida. Appellant replied that "he had called him [Hunt] about some carpet." (R. 401)
Harrison Wilson, first cousin of appellant and owner of a used car lot, stated that on March 7, 1981, he sold Williams a 1970 green Plymouth Valiant. Wilson had recently painted the car a darker shade of green than that which it had previously been. Wilson stated that two men had come to buy the car, but Williams was the purchaser.
Mary Dawdy, employee and custodian of records of the Haines City, Florida, Holiday Inn, testified that her records indicated that on March 9, 1981, through March 12, 1981, appellant was registered in room 440 of the motel. Her billing records indicated that at 10:25 p.m. eastern time on March 10 appellant placed a call to Hunt at 833-8018. *Page 846 
Dawdy retrieved the billing information concerning the long distance call from a record originated by a telephone company printer located at the motel front desk. The printer supplied the room number from which the call was made, the date, the area code, telephone number, and the total charge. Dawdy stated that the information was printed "almost immediately" (R. 421) after the call was made. Dawdy stated that the printout was maintained by her in the ordinary course of business.
Shortly after appellant's stay at the motel, Alabama law enforcement investigators viewed the original printout. Attempts to photocopy the document failed because the printout was too light for reproduction. Subsequent thereto, Florida law enforcement investigators viewed the original printout. At this time, one of the Florida investigators typed the information contained on the printout onto a sheet of stationery. Dawdy confirmed the accuracy of the information contained therein and had it notorized. Prior to her traveling to Alabama to testify, Dawdy diligently searched for the original, but could not locate it. She opined that due to its being retrieved several times in the past, the document was probably misfiled. She did not feel that the original was lost, but after a careful search was unable to locate it prior to trial. The trial court admitted the typed copy into evidence.
Dawdy's testimony concluded presentation of the state's case. The trial court struck counts one and three of the indictment and denied appellant's motion for judgment of acquittal for failure to prove a prima facie case as to count two.
 I
The constitutionality of Section 13-11-1, et seq. Code of Alabama 1975, has been determined in Beck v. State,396 So.2d 645 (Ala. 1980). Thus, denial of appellant's demurrer to and motion to quash the indictment on this ground was without error.
 II
Appellant contends that the trial court abused its discretion in denying his motion for a change of venue. He asserts that extensive pre-trial publicity prevented him from impanelling "a fair and impartial jury." (R. 538)
Appellant focuses our attention on the large number of veniremen who responded to voir dire questions concerning their prior knowledge of the instant case.
Extensive voir dire examination was conducted for those veniremen who had read or heard about the instant incident. Both of the parties, as well as the trial court, carefully and thoroughly questioned each venireman individually about their prior knowledge of the facts of appellant's, Hunt's, and Williams' cases. The trial court granted three of appellant's nine challenges for cause. Having reviewed the testimony of those excused, we find their dismissal proper.
The record reflects that each venireman questioned had read or heard, in varying degrees, about the murder of the victim. Their knowledge was based on news reports or rumors remote in point of time to the trial. Their collective knowledge contained a paucity of detail as to the events surrounding the fatal shooting. All of the veniremen, even those excused for cause, unequivocally stated that regardless of their knowledge of the case, they could follow the instructions given to them by the trial court as well as render a fair and impartial verdict based solely upon the evidence presented at trial. No venireman expressed a fixed opinion or bias against appellant and stated that they could disregard anything that they had read or heard about appellant's case.
The rules concerning change of venue were recently stated inNelson v. State, 440 So.2d 1130 (Ala.Cr.App. 1983); Duncan v.State, 436 So.2d 883 (Ala.Cr.App. 1983); Hopkins v. State,429 So.2d 1146 (Ala.Cr.App. 1983); Moulds v. State, 426 So.2d 942
(Ala.Cr.App. 1982), and Lopez v. State, 415 So.2d 1204
(Ala.Cr.App. 1982). See also Williams v. State, [Ms. 6 Div. 761, May 31, 1983] (Ala.Cr.App. 1983). We *Page 847 
have applied those standards to the instant facts and find no violation thereof as they do not establish that a fair and impartial trial could not be had and an unbiased verdict could not be reasonably expected in Jefferson County. We further find that the newspaper articles are not inherently prejudicial and the community not so saturated with prejudicial pre-trial publicity as to have a probable impact upon the prospective jurors. The voir dire examination clearly established the non-adverse effect of the pre-trial publicity upon the community in general and appellant's venire in particular. Further, there was no showing of a connection between the publicity generated by the media coverage and the existence of actual jury prejudice. See Johnson v. State, 433 So.2d 473
(Ala.Cr.App. 1982), aff'd, 433 So.2d 479 (Ala. 1983).
We have reviewed the supplemental record submitted by appellant on this issue and find nothing therein which would affect the above findings.
Based upon the foregoing authorities, we find no abuse of the trial court's discretion in denying appellant's motion for change of venue.
 III
The admission of appellant's extrajudicial statements made to Emerson was not error.
Appellant's statements to Emerson on March 23 or 24 were not the product of a custodial interrogation. At the time Emerson interviewed appellant, he was in the process of investigating the death of the victim and had not focused his inquiry upon appellant. Furthermore, appellant was not a suspect, in custody, or under arrest at the time of the interview. Consequently, admission of appellant's statements was not error. Jackson v. State, 412 So.2d 302 (Ala.Cr.App. 1982);Manigan v. State, 402 So.2d 1063 (Ala.Cr.App.), cert. denied,402 So.2d 1072 (Ala. 1981); Stewart v. State, 398 So.2d 369
(Ala.Cr.App.), cert. denied, 398 So.2d 376 (Ala. 1981).
Mere failure of an accused to sign a waiver of rights form does not vitiate an otherwise voluntary custodial statement. We find the facts of the instant case strikingly similar to those in Harris v. State, 420 So.2d 812 (Ala.Cr.App. 1982); Proctorv. State, 391 So.2d 1092 (Ala.Cr.App. 1980); Waters v. State,360 So.2d 358 (Ala.Cr.App.), aff'd, 360 So.2d 367 (Ala. 1978); and Houston v. State, 56 Ala. App. 295, 321 So.2d 261 (1975), wherein, upon review of the record, this court found the properMiranda rights given, voluntariness predicate established, and, ultimately, a knowing, intelligent, and voluntary waiver thereof regardless of the accused's refusal to sign a waiver of rights form.
The instant facts fully support the findings of the trial court that appellant was fully apprised of his Miranda rights and knowingly and voluntarily waived them. Based upon the preceding authorities, we find no error in the admission of appellant's custodial statements.
 IV
Admission of the type-written copy of the motel printout evidencing appellant's telephone call to Hunt was proper as not violative of the best evidence rule or the hearsay rule.
 "The best evidence rule requires a party who wishes to prove the terms or contents of a writing to introduce the original into evidence if available. . . . Furthermore, as prerequisites to the introduction of secondary evidence it must be shown to the reasonable satisfaction of the trial judge that: (1) the original is lost, has been destroyed, or is otherwise unavailable and, (2) that every reasonable effort to procure the original has been made. . . . Only after satisfying the above conditions may a party offer a copy of the original or oral testimony concerning its contents. The purposes of the rule are to prevent fraud and to insure the reliability of the oral testimony concerning the writing. . . ." (Citations omitted.) Howton v. State, 391 So.2d 147, 150 (Ala.Cr.App. 1980). *Page 848 
The state's evidence fully and thoroughly established the above requisites. Submission of the typed copy rather than a photocopy is immaterial here, as the testimony unequivocally established the poor photocopy reproduction qualities of the original.
The document qualified under the business records exception to the hearsay rule. Ala. Code § 12-21-43, -44 (1975). As stated in Gamble, McElroy's Alabama Evidence § 254.01 (3) (3rd ed. 1977):
 "Testimony by any witness, frequently the custodian of the record, that the document now exhibited to him is a record of the business; that he knows the method (i.e., the standard operating procedure) used in the business of making records of the kind now exhibited to him; and that it was the regular practice of the business to make records of such kind and to make them at the time of the event recorded or within such specified period thereafter as could be found by the trier of fact to be reasonable, is a sufficient authentication of the record to require its admittance in evidence. (Footnote omitted.)
See Coleman v. State, 423 So.2d 276 (Ala.Cr.App. 1982); See also Anno., 7 A.L.R. 4th 8 (1981).
Dawdy's testimony clearly proved that she was knowledgeable in the procedure by which the printout was produced; that such was a regular practice of the motel to make and maintain the record with such maintenance occurring at the time of the event (telephone call) or within a reasonable time thereafter; and that the admitted document was a verified and notarized type-written copy of an otherwise unavailable original.
Consequently, the state's evidence established compliance with both rules of evidence and, therefore, was properly admitted. Gamble, McElroy's § 254.01 (5), supra.
 V
Appellant contends that insufficient independent evidence of a conspiracy existed at the time the trial court admitted evidence of his confederate's hearsay acts and statements.
Under § 13A-2-23 Code of Alabama 1975:
 "A person is legally accountable for the behavior of another constituting a criminal offense if, with the intent to promote or assist the commission of the offense:
 "(1) He procures, induces or causes such other person to commit the offense; or
 (2) He aids or abets such other person in committing the offense; or
 (3) Having a legal duty to prevent the commission of the offense, he fails to make an effort he is legally require to make."
"The initial existence of a conspiracy may not be proved by the statements of the co-conspirator." Ingle v. State,415 So.2d 1225, 1228-29 (Ala.Cr.App. 1982). "Before the statements of one co-conspirator may be admitted against another co-conspirator, only prima facie evidence of the existence of the conspiracy is necessary." Lewis v. State, 414 So.2d 135,140 (Ala.Cr.App.), cert. denied, 414 So.2d 140 (Ala. 1982). "An unlawful conspiracy need not be proved by positive evidence, but may be proved from the conduct of the parties, circumstances surrounding the act and from the conduct of the accused subsequent to the act." Eldridge v. State,418 So.2d 203, 205 (Ala.Cr.App. 1982); Lewis, supra; Williams v. State,383 So.2d 547 (Ala.Cr.App. 1979); aff'd, 383 So.2d 564 (Ala.),cert. denied, 449 U.S. 995, 101 S.Ct. 534, 66 L.Ed.2d 293
(1980). While it is preferable that the testimony of a co-conspirator or hearsay testimony concerning the acts and statements of a co-conspirator be received into evidence after a prima facie showing of the existence of a conspiracy, such order of proof is not mandatory. "The order of proof requirement is for the purpose of expediting the trial and saving the valuable time of the trial court, rather than protecting or securing any supposed right a defendant might have." Nance v. State, 424 So.2d 1358, 1365 (Ala.Cr.App. 1982);Snoddy v. State, 20 Ala. App. 168, 101 So. 303 (1924); Smith v.State, 8 Ala. App. 187, *Page 849 62 So. 575 (1913). The determination of whether vel non there is prima facie evidence that a conspiracy exists is initially for the trial court. Once it so determines the existence of such, the question then becomes one for the jury.Williams, supra. Once proof of a conspiracy exists, "any act or statement by an accused's co-conspirator in the commission of the crime, done or made before the commission of the crime, during the existence of a conspiracy and in furtherance of a plan or design, is admissible against the accused." Nance, 424 So.2d at 1364-65; Bynum v. State, 348 So.2d 804 (Ala.Cr.App. 1976), cert. quashed, 348 So.2d 828 (Ala. 1977), cert. denied,434 U.S. 1034, 98 S.Ct. 766, 54 L.Ed.2d 781 (1978).
The state's evidence established that: (1) In the fall of 1980, appellant was looking for a person who would kill another for a price; (2) The victim was his girlfriend's husband, whose residence was only a short distance from appellant's home; (3) Appellant was romantically involved with the victim's wife; (4) In January of 1981, appellant informed his roommate, Bagwell, that he had found someone to kill the victim; (5) During the AEA school vacation, appellant, Mrs. Taylor, and their children went to Florida; (6) On March 10, 1981, while in Florida with Mrs. Taylor, appellant called Hunt; (7) On March 21, 1981, the victim was murdered; (8) About forty-five minutes to one hour prior to the victim's death, Hunt and Williams were observed together about three-quarters of a mile from the victim's home in a green Plymouth Valiant, the paint of which was later found embedded in the victim's truck; (9) in his statement to Emerson, appellant admitted "he knew of Red Hunt" and had talked to him once about some carpet work, but had not talked to or seen him in over a year; and (10) Dawdy and Whittaker verified appellant's telephone call to Hunt from Florida on March 10.
We find the above facts sufficient to establish a prima facie showing of a conspiracy among appellant, Hunt, and Williams. Consequently, the trial court properly admitted the acts and statements of Hunt and Williams made to third persons during the existence of the conspiracy. Bynum, supra.
 VI A
The testimony of McCain in which he stated that on the morning of March 22, Williams displayed to him $1500 was properly admitted as, "[t]he State may prove, against the accused, the existence after the crime of a physical fact which tends to show the guilt of his co-conspirator." (Emphasis added.) Stinson v. State, 401 So.2d 257, 260 (Ala.Cr.App.),cert. denied, 401 So.2d 262 (Ala. 1981); and cases cited therein.
 B
The admission into evidence of the address books seized from Hunt and Williams on the day of their arrest, and the testimony of Emerson concerning the names, addresses, and telephone numbers of appellant, Hunt, and Williams contained therein was merely cumulative evidence of that which the remainder of the state's evidence properly established, namely, that the confederates knew each other and were more than mere "acquaintances," and had recently communicated with each other.
 "The admission of improper evidence to establish an undisputed fact is harmless error. . . . Likewise the appellant's admission to Lieutenant Watkins that she had the rifle and would go get it was not error in view of the fact that she had already and very recently admitted her possession of the weapon to Investigator Culpepper. . . . Before Watkins testified the rifle had been described and identified as being the weapon stolen and the one found in the possession of the appellant. The statements the appellant made to Lieutenant Watkins were cumulative in that her possession of the rifle had already been proven by statements she made to Culpepper which not only showed possession but also guilty knowledge. *Page 850 
Under these circumstances the appellant's statement that she had the rifle, even if improperly admitted because of the lack of the Miranda warnings, only constituted harmless error. . . .
 "The admission of incompetent evidence is harmless where the facts thereby disclosed are otherwise established by competent evidence. . . . A judgment will not be reversed because of the admission of incompetent evidence, where the other evidence, which was uncontradicted, would require the same verdict. . . . The admission of evidence which is merely cumulative of an admitted fact is error without injury to the defendant. . . ." (Citations omitted.) Cassidy v. State, 369 So.2d 310, 312
(Ala.Cr.App. 1979).
See Holm v. State, 416 So.2d 782 (Ala.Cr.App. 1982); Gullatt v.State, 409 So.2d 466 (Ala.Cr.App. 1981); Chambers v. State,400 So.2d 436 (Ala.Cr.App. 1981); see generally Wyatt v. State,419 So.2d 277 (Ala.Cr.App. 1982).
 VII
Having carefully reviewed the evidence presented by the state, we find the jury's determination that appellant, Hunt, and Williams conspired to and did in fact kill the victim amply supported thereby. See Pennington v. State, 421 So.2d 1361
(Ala.Cr.App. 1982). Consequently, the trial court properly denied appellant's motions for judgment of acquittal and for a new trial. Dolvin v. State, 391 So.2d 133 (Ala. 1980); Cumbo v.State, 368 So.2d 871 (Ala.Cr.App. 1978); cert. denied,368 So.2d 877 (Ala. 1979); see generally Heath v. State, [Ms. 4 Div. 134, July 5, 1983] (Ala.Cr.App. 1983).
We have reviewed appellant's contentions raised on appeal and find no error. Thus, this cause is hereby affirmed.
AFFIRMED.
All the Judges concur.
[1] See Williams v. State, [Ms. 6 Div. 761, May 31, 1983] (Ala.Cr.App. 1983).