341 So.2d 735 (1976)
Samuel CAMPBELL
v.
STATE.
1 Div. 643.
Court of Criminal Appeals of Alabama.
May 4, 1976.
Rehearing Denied June 1, 1976.
*736 David L. Barnett, Mobile, for appellant.
William J. Baxley, Atty. Gen., and G. Daniel Evans, Asst. Atty. Gen., for the State.
LEIGH M. CLARK, Supernumerary Circuit Judge.
This is an appeal from a conviction of murder in the second degree and a sentence of ten years imprisonment in the penitentiary.
The plea was not guilty, to an indictment charging murder in the first degree. Defendant shot the alleged victim, Willie Bonner, with a shotgun. They were across-the-street neighbors. They had just had a fight at a nearby barbecue stand that resulted in Bonner's shooting defendant in the leg with a pistol. Thereafter each went to his home. Defendant got a shotgun, came out of a door of his house and shot Bonner as he was standing behind a screen door of Bonner's house. Defendant said that he did so as Bonner was sticking his hand, with the gun in it, out of the door. Whether the killing of Bonner was justified by the principle of self-defense, as explained fully by the trial court, was a jury question, and there is no contention on appeal to the contrary.
*737 Four photographs of Bonner were taken at the Mobile General Hospital, after he had expired there on the table while being operated upon for his gunshot wounds. Detective Leslie Nobles, who took pictures of Bonner at the hospital and who observed Bonner both before and after he died and who said he had previously seen from five to ten people who had been blasted with a shotgun and died, was asked by the State, "And in light of that past experience, do you have an opinion as to the cause of death of this man?" Thereupon the following occurred:
"MR. BARNETT: Judge, I'm going to object to that; improper predicate.
"MR. HALE: That's more than the average juror, Judge, to help them . . .
"THE COURT: Go ahead. Overruled.
"A From a gunshot wound to the chest-stomach area.
Whether the objection made sufficiently raised the question of the witness' qualification to give his opinion as to the cause of Bonner's death need not here be decided, for we think under the circumstances, taking into consideration the photographs themselves, as well as the other evidence as to Bonner's injury, the court was correct in allowing the witness to testify as he did. Whether a particular witness is qualified to testify as to the cause of death depends greatly upon the circumstances. Whenever a purely medical question is obvious, one is hardly an expert unless he has had experience in the medical field. In this case, however, the testimony of medical personnel was not necessary. In Jones v. State, 155 Ala. 1, 46 So. 579, it was held that nonexpert witnesses could not testify that a bullet in the abdominal cavity of the alleged victim of homicide was the cause of his death. However, in Birmingham & A. Ry. Co. v. Campbell, 203 Ala. 296, 298, 82 So. 546, in holding that a lay witness could testify as to whether her husband had had "any other troubles" between the time of his injury and death and in distinguishing Jones, it was said, "The case of Jones v. State, 155 Ala. 1, 46 South. 579, is not to the contrary. In harmonizing Jones, it has been stated:
"`To authorize a witness to give an opinion as an expert, it must appear that, by study, practice, experience, or observation as to the particular subject, he has acquired a knowledge beyond that of ordinary witnesses.'" demons v. State, 167 Ala. 20, 52 So. 467, 471.
"In the rather recent case of Hicks v. State, 247 Ala. 439, 25 So.2d 139 cited in our original opinion, the Supreme Court held: `The nature of a wound or injury, its probable cause and effect can be stated by expert medical witnesses, or witnesses shown to be familiar with such questions; such as, an undertaker, or other showing competency. Whether a witness is shown to possess the requisite qualifications is a preliminary question said to be largely within the discretion of the court.'" Scott v. State, 34 Ala.App. 18, 37 So.2d 670, cert. denied 251 Ala. 440, 37 So.2d 674.
In the case now before us, there was no controversy as to the cause of death. The whole case revolved around the question whether defendant was acting in self-defense. Defendant objected to the photographs of the victim by reason of their allegedly inflammatory nature, that is, the horrible injury the photographs show that he received. Testimony of Officer Nobles as to the cause of death is not to be equated with the testimony of a nonexpert as to a purely medical question. The witness saw Bonner in his wounded condition, while on the operating table, and soon thereafter he observed his corpse in the morgue. As pointed out by Judge Tyson in Cobb v. State, 50 Ala.App. 707, 282 So.2d 327,
". . . [T]he mere fact that a witness is not a physician does not preclude his testimony as to cause of death. However, the fact that the witness is a coroner, mortician, professor, or toxicologist does not per se qualify him as an expert on causes of death."
No case in Alabama has been brought to our attention on the question whether an experienced police officer can testify as to *738 the cause of death in a homicide case, and we think that probably testimony by persons other than those mentioned in the quotation from Cobb, supra, or like professionals, should not be encouraged in cases in which there could be reasonable doubt as to the cause of one's death, even though he had been felled, to rise no more, by the load from a shotgun. Where, as here, there could have been no reasonable doubt, and the witness is shown by the testimony to have had more knowledge on the subject than that of an ordinary witness, we are convinced that no error prejudicial to defendant resulted from the court's overruling defendant's objection to the question asked Officer Nobles.
The remaining questions raised by appellant relate to the action of the court in permitting the prosecution to show statements by defendant soon after his arrest, in conflict with his testimony on the trial.
While questioning Detective Nobles on rebuttal, State's counsel interrogated him rather extensively as to two written statements defendant made after he was arrested, one the day of his arrest and the other three days after. Defendant had been questioned by the prosecution on cross-examination of him as a witness, and he had admitted that the written statements were incorrect in two or three particulars. He explained that the first written statement was made after he was advised by some of his fellow prisoners that he had "better say that [the gun with which defendant shot Bonner] was his [Bonner's] gun," but that upon talking with his mother, she had persuaded him to tell the truth, and that he had corrected the errors of the first statements in making the second statement some three days thereafter. During this interrogation, it appears that counsel for prosecution was reading from one or the other of said statements, but neither statement was offered in evidence, and we do not have the benefit of either. In rebuttal, while interrogating Officer Nobles, counsel for the prosecution questioned the witness as to the first statement. The court at first sustained defendant's objection as shown by the following:
"Q. Now, could you tell us what he told you concerning that second shooting out there on West Clark Street when Willie Bonner was killed?
"A. You want the first statement he gave me on the 22?
"Q. The one on the 22nd, what he told you that particular . . . the second shooting, if you can . . .
"MR. BARNETT: Judge, I'm going to object to that. Improper predicate.
"THE COURT: Sustained.
"Q. Officer Nobles, did he make you a statement?
"A. Yes, he did.
"MR. BARNETT: I'm going to object to that. Improper predicate.
"THE COURT: Sustained.
Immediately thereafter the following occurred.
"MR. HALE: Judge, it's for impeachment purposes.
"MR. BARNETT: They've cross-examined him at length and I think that's the only thing they're able to do at this point.
"THE COURT: Go ahead.
"Q. Does the statement differ from what he said here on the stand?
"MR. BARNETT: I object to that . . .
"THE COURT: Overruled.
"MR. BARNETT: Object on improper predicate, Judge.
"THE COURT: Overruled.
"Q. Did it?
"A. Yes, it did.
"Q. Can you tell the jury how it differed from what he said here on the stand.
"MR. BARNETT: I object to that. The statement speaks for itself.
THE COURT: Overruled. Go ahead.
"MR. BARNETT: Excuse me. I want to also object on having the officer explain what the statement says. The statement speaks for itself.
"THE COURT: You can ask him questions. That's all you'veall you've asked him so far, Mr. Hale. I can't tell you what to do, but you can ask questions.

*739 "Q. Now, did heis that Samuel Campbell's signature right there?
"A. Yes, it is.
"Q. And when you took the statement from him did you read the statement to him?
"A. Yes, I did.
"Q. Can he read?
"A. Yes.
"Q. Did he read over the statement?
"A. Yes.
"Q. And did he acknowledge to you that it was true and correct at the time he gave it to you?
"A. At the time he did.
"Q. Okay, did he ever tell you that he wished to add anything to that statement?
"MR. BARNETT: Judge, I'm going to object to it . . .
"A. At that time . . .
"MR. BARNETT: Excuse me. I'm going to object; improper predicate.
"THE COURT: I think you all went into this on direct. Overruled.
"A. At the time I asked him the question: `Is there anything you want to add or take away from this statement?' `No, that's all.' That's his answer.
"Q. Tell us on that statement right there that he gave to you that he signed and said was correct, on the first statement on December 22, pertaining to that second shooting, what was different from what he said on the stand.
"MR. BARNETT: I object because the statement speaks for itself.
"MR. HALE: Judge, I'll offer the statement, that portion of the statement into evidence, then, if that's what Mr. Barnett wants.
"MR. BARNETT: I'll object to offering any portion of it. If he wants to try to offer all of it, then I think itanything that's inculpatory or exculpatory should be both offered. I don't think you can offer part of a statement.
"MR. HALE: Judge, the purpose is purely for impeachment and . . .
"MR. BARNETT: Judge, he's gone into all of this on cross-examination of my client. I object to . . .
"MR. HALE: But I haven't shown that he's made it, Judge.
"THE COURT: Overruled.
"MR. BARNETT: I would object to it, Judge, and make this statement. This is not in the nature of rebuttal and would also object on . . .
"THE COURT: Overruled.
"MR. BARNETT: Not rebutting anything that hasn't already been testified to.
"THE COURT: Overruled.
"Q. What did he say regarding that second shooting where he shot Willie Bonner?
"MR. BARNETT: Object to that, Judge, on improper predicate.
"THE COURT: Overruled.
"MR. BARNETT: Excuse me, Judge, could I just have a continuing objection to all of this on the grounds of improper predicate?
"THE COURT: Sure. Go ahead."
Thereafter counsel for the State continued to question Officer Nobles as to this statement on December 22, 1974, and after asking several questions, interrogated him about the statement he made three days after the first statement, including questions shown by the following:
"Q. And did you hear what he said up on the stand concerning the second shooting here at the trial?
"A. Yes.
"Q. Now, did that second statement differ from what he said up on the stand?
"A. Yes, it is.
"Q. And does it differ from what he said in the first statement?
"A. Right.
"Q. Tell us concerning that second shooting what he said on the 25th.
"A. `By the time I was coming out of my door he was coming out of his door and I shot him and then I ran into the field and my leg gave out on me and the *740 Police surrounded the field and I saw them and said, "I'm coming out."'
"Q. Okay, now, during that second statement did he tell you anywhere in that statement about a second shot being fired? By the victim, the dead man? Anywhere during that statement?
"A. No, he didn't.
"Q. Did he ever tell you anything about what he said about the sister being in there in the statement?
"A. No, he didn't.
"Q. Did he tell you anything about the sister telling him that, `Here he comes now'?
"A. No, he didn't.
"Q. Did he tell you anything about him then going into the bedroom after the sister told him that and getting his gun?
"A. No, he didn't.
"Q. In that statement did he tell you that the victim had a gun, in that statement, in the second shooting incident?
"A. No, he didn't."
Appellant says that the State should have shown the voluntariness of the statements before being allowed to impeach defendant as a witness by such statements. Appellee argues that the predicate of voluntariness is not involved, that the statements were used solely for the purpose of impeaching defendant's credibility as a witness and that it was unnecessary to show that the statements were voluntarily given. Appellee is correct in citing Blackwell v. State, 264 Ala. 553, 88 So.2d 347 (1956); Alberson v. State, 254 Ala. 87, 47 So.2d 182 (1950); Brown v. State, 243 Ala. 529, 10 So.2d 855 (1940), all to that effect. However, the cited cases must be considered in the light of subsequent pronouncements in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), and Harris v. New York, 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971). Appellant seems to concede that the prosecution is not required to establish the Miranda predicate before attempting to impeach defendant as a witness by showing prior self-contradictory statements, but does not concede that the prosecution should not be first required to show that the self-contradictory statements were voluntarily made.
In Harris it was stated:
"It does not follow from Miranda that evidence inadmissible against an accused in the prosecution's case in chief is barred for all purposes, provided of course that the trustworthiness of the evidence satisfies legal standards." (Emphasis supplied).
We see no escape from the conclusion that Miranda and Harris, considered together, stand for the proposition that, although the requirements added by Miranda as a predicate to the admission in evidence of confessions, or the like, are not necessary when such confession is used solely for the purpose of impeaching defendant as a witness, the admission thereof in evidence, even for the sole purpose of impeachment, is erroneous unless the predicate of trustworthiness or voluntariness is established.
It is settled in Alabama that admissions directly relating to the facts or circumstances of the alleged crime and connecting the defendant therewith are inculpatory admissions in the nature of a confession and are subject to the same rules as direct confessions, which are prima facie involuntary and inadmissible, but that admissions as to purely collateral matters, which are not confessory of guilt in any respect, are not within the scope of the rule, and the predicate as for a confession need not be laid. McGehee v. State, 171 Ala. 19, 55 So. 159; Monk v. State, 258 Ala. 603, 64 So.2d 588; Tillison v. State, 248 Ala. 199, 27 So.2d 43; Read v. State, 195 Ala. 671, 71 So. 96; Reeves v. State, 260 Ala. 66, 68 So.2d 14; Jordan v. State, 26 Ala.App. 122, 156 So. 642. According to the established rule, we have no doubt that if the statements admitted in evidence had been offered in evidence before defendant took the stand as a witness they would have been inadmissible unless and until their trustworthiness or voluntariness had been shown. They come within the classification of inculpatory admissions in the nature of confessions.
*741 Whether the erroneous admission of inculpatory statements in the nature of a confession constitutes prejudicial error depends at times upon the real issue, the contested issue, in the case. The plea was not guilty, but the contested issue in this case was chiefly whether the homicide was justified by reason of the principle of self-defense. It can be seen that prior self-contradictory statements could have been harmless to defendant on a particular feature of some of the essential elements of self-defense if they had been more favorable to defendant than his testimony, such as his in-custody statements where he claimed that the gun with which he shot the victim was the victim's gun, which he admitted he made but stated they were not true. On the other hand, the prosecution attempted to show, and was allowed to show, that some parts of one or both of the in-custody statements were more favorable to defendant on the issue of self-defense than was his testimony on the trial. An illustration is to be found in his second in-custody statement in which he omitted to tell the officers that at the time he shot the victim, the victim had a gun, as compared to his testimony that at such time the victim had a gun (a pistol) in his hand, which he stuck out the door, and that the gun was pointed toward him. Furthermore, in his testimony, defendant said that at the time the victim "could have shot the gun." The prosecution was allowed to show by the impeaching witness that, in the second in-custody statement, defendant made no reference to a shot being fired by the victim. The importance of the contrast between what defendant stated while in custody and his testimony is emphasized by the fact that the witness was asked by the prosecution whether it was different from what defendant said on the stand, and the witness replied, "Yes, it is." It is to be seen that the witness was allowed to testify, over the objection of defendant, that defendant had made an in-custody statement different from his testimony on the stand, which in-custody statement, the second one, was more favorable to defendant than his testimony on the stand on the issue of self-defense. The erroneous admission of the testimony of parts of his second in-custody statement was substantially harmful to defendant. The injury was probably compounded by the opinions expressed by the witness as to a difference between the testimony of defendant and his previous written statements. The accuracy of such opinions could not have been tested by the jury without knowledge, which it never had, of the full contents of the written statements. The judgment should be reversed and the case remanded for a new trial.
The foregoing opinion was prepared by Supernumerary Circuit Judge LEIGH M. CLARK, serving as a judge of this Court under Section 2 of Act No. 288 of July 7, 1945, as amended; his opinion is hereby adopted as that of the Court. The judgment below is hereby
REVERSED AND REMANDED.
TYSON, HARRIS and BOOKOUT, JJ., concur.
DeCARLO, J., dissents.
DeCARLO, Judge (dissenting).
I am of the opinion that Harris v. New York, supra, does not compel the result approved by the majority in this case.
Harris v. New York, deals with prior inconsistent statements made by accused to police and used only for the purpose of impeaching his credibility. The Supreme Court held that even though the statements were inadmissible to establish the State's case in chief under Miranda, supra, they were available for impeachment purposes.
The Supreme Court observed:
"Every criminal defendant is privileged to testify in his own defense, or to refuse to do so. But that privilege cannot be construed to include the right to commit perjury. See United States v. Knox, 396 U.S. 77, 90 S.Ct. 363, 24 L.Ed.2d 275 (1969); cf. Dennis v. United States, 384 U.S. 855, 86 S.Ct. 1840, 16 L.Ed.2d 973 (1966). Having voluntarily taken the stand, petitioner was under an obligation to speak truthfully and accurately, and *742 the prosecution here did no more than utilize the traditional truth-testing devices of the adversary process. Had inconsistent statements been made by the accused to some third person, it could hardly be contended that the conflict could not be laid before the jury by way of cross-examination and impeachment." (Emphasis added).
The Court went on to say:
"The shield provided by Miranda cannot be perverted into a license to use perjury by way of a defense, free from the risk of confrontation with prior inconsistent utterances."
Miranda, dealt with the use of a confession for the purpose of providing probative facts required to establish the necessary elements of a crime with which defendant was charged. It is grounded upon the proposition in the Fifth Amendment that no man shall be compelled to give incriminating evidence against himself.
Incriminating evidence is that which tends to show that the defendant did certain acts from which a trier of fact could conclude that accused committed the offense charged. The purpose of the rule of exclusion is to prevent introduction of statements made by a defendant which tend to establish his guilt. Introduction of statements made by a defendant by way of impeachment to test the credibility of his testimony does not serve that purpose.
Assuming the statements were inadmissible as direct evidence of guilt, they could be used for impeachment purposes after appellant took the stand.
As I view the contention, it is simply the lack of a predicate showing the statements were voluntary and uncoerced. No assertion is made that the statements were in fact coerced or involuntarily made, or is there the intimation that such was the case.
This precise issue was before the Kansas Court in 1973, in the case of State v. Osbey, 213 Kan. 564, 517 P.2d 141. There the court reasoned:
". . . (T)hat an accused who offers himself as a witness in his own behalf may be impeached by proof of inconsistent statements contained in a confession not properly qualified for admission on the prosecution's case in chief for want of a hearing determining that it was voluntarily made."
In 1974, our own court spoke to this issue in Bates v. State, 52 Ala.App. 257, 291 So.2d 351. There this court held:
". . . (T)hat a defendant who becomes a witness for himself, submits himself to cross-examination as any other witness; and that he may be cross-examined on statements in conflict with his testimony without a showing that such statements were voluntary and were, therefore, inadmissible as a confession."
In view of the foregoing, I do not believe that Harris v. New York, encompasses the extension given to it in this majority opinion.
I respectfully dissent.