TYSON, Presiding Judge.
The appellant was indicted for the first degree murder of John Edward Harbin “by shooting him with a pistol.” The jury found the appellant guilty of murder in the first degree as charged and fixed his punishment at life imprisonment. The trial court then set sentence in accordance with this verdict.
Mrs. Charlotte Harbin, the wife of the victim, testified that the last time she saw her husband alive was around 7:00 a. m., Friday, December 13,1974. She stated that on Sunday, December 15, 1974, she viewed the body of her husband at Johns-Ridouts Funeral Home.
Jefferson County Coroner James Butler, Sr., testified that around 10:25 a. m. on December 14, 1974, he received a call to come inspect a body which had been found by hunters an hour and a half before. The body was discovered beside the Hamilton-Oporto Mine Road near Daniel Payne College and identified at this site by a Clyde Walker, Jr., as that of John E. Harbin. Upon examining the body, Coroner Butler observed that Harbin had received a close entry gunshot wound in the right cheek. Coroner Butler stated that the “contusion around the wound was of the characteristics as if the muzzle [of the pistol] had been placed against the skin [and then fired].” Coroner Butler further testified that when he had concluded his preliminary investigation, he ordered that the body be taken to Mercy Hospital (now Cooper Green Hospi *589 tal) where he witnessed an autopsy conducted by Pathologist Jay Glass. Coroner Butler stated that at the hospital he took custody of a .38 caliber bullet which had been removed from the head of the slain victim and kept it in his possession until he turned the bullet over to State Toxocologist Dr. Robert B. Johnson the following day.
Officer James A. Howell, the evidence technician of the Jefferson County Sheriffs Department, testified he went to the site where Harbin’s body was found and took several photographs. He stated that he searched the immediate area around the body and found a .38 automatic shell casing.
Pathologist Jay Glass testified that he conducted the autopsy on the body of John Harbin at Mercy Hospital under the direction of a Dr. Jean Garret. He stated that his external examination of the victim’s body revealed that a projectile had entered the head about a half inch below the right cheek bone. The witness testified that he then conducted an internal examination of the head by reflecting the victim’s scalp and removing the top of his skull. He noted that the projectile had perforated both cerebral hemispheres of the brain, the left side of the skull, and lodged just underneath the left scalp.
Ms. Jean Clements, who was an employee of the victim at Harbin Oil Company, testified she had been with Mr. Harbin during the evening of December 13, 1974 — the night before his body was found on Saturday morning. She stated he requested her to accompany him while he drove another employee to his Cordova oil refinery, and that they left Birmingham around 6:30 p. m. and returned about 8:15 p. m. She stated that after returning to Birmingham, he dropped her off at her car which was parked near 12th Avenue and 31st Street, North. The witness stated that Mr. Harbin was driving a brown over yellow Buick Electra, tag number 64-998. She further testified that about three weeks before his death, Mr. Harbin had purchased a blue Smith-Corona typewriter from her and that he had placed the typewriter in the trunk of his car.
Glenn Tommy Williams, an acquaintance of the appellant for ten years, stated that during the summer of 1974, he had purchased a .38 Colt automatic pistol from his brother. Williams stated that around October, 1974, he loaned this gun to the appellant and the appellant did not return the .38 pistol to him until December 20, 1974. The witness testified that on December 24,1974, the pistol was stolen during an armed robbery of the service station where he was employed.
Linda Marie Silmon, a girl friend of the appellant, testified that on the afternoon of December 13, 1974, the appellant drove her to her job at Cooper Green Hospital where she was employed as a nurses’ assistant. She stated she next saw the appellant at her home around 4:00 a. m. the following morning. The witness testified that the appellant told her at this time, “He had messed up ... he had shot some white men.” Ms. Silmon stated that the appellant had in his possession a pistol and a blue typewriter. The witness further testified that on the afternoon of this same day, she told the appellant that she had read about the incident in the newspaper and that the appellant replied, “They didn’t have any proof . . . .” She concluded her testimony by stating that on another occasion, when she asked the appellant about the gun he had used, the appellant told her “that he gave it back to Glenn [Williams].”
On cross-examination, Ms. Silmon stated that she was uncertain whether the appellant was referring to his possessing stolen property or his having shot two white men when he told her that “he had messed up,” and she further testified that she was not exactly sure when he made this statement to her.
Johnny Buford Silmon testified that around 1:30 a. m. on December'14, 1975, he received a phone call from the appellant and that the appellant stated he was “out of gas.” Silmon testified that he told appellant he did not have a car but that he would get him some gas the best way he could. The witness stated he next saw the *590 appellant several hours later at his sister’s house and that the appellant had in his possession a pistol, a calculator, and a typewriter. Silmon testified that appellant told him he had taken these items from a white man he had shot. He further testified that the pistol the appellant had taken from this man had a “chrome stock and brown handle.”
Sergeant Howard Brooks testified that based upon information he had obtained in his investigation of the John Harbin homicide, he was able to secure a search warrant which commanded him to search the home of Linda Marie Silmon at 3169 43rd Avenue in Birmingham. He stated that the search of her home produced, among other things, one Smith-Corona typewriter, Serial No. 6YC13969, and “one pair of bloody field glasses.” He stated that he supervised this search of Ms. Silmon’s home on January 2, 1975.
Officer James A. Howell was recalled and testified that he participated in the search of Ms. Silmon’s home on January 2, 1975, and that he found both the typewriter and binoculars on a shelf in a hall closet. Officer Howell further testified that on December 16, 1974, Mr. Harbin’s automobile was found “just off the freeway headed toward Tuscaloosa.” He stated that he went to the place where the ear was discovered, took several photographs, then personally drove the car to the Sheriff’s Office where he processed the car “inside and out” for fingerprints. Officer Howell stated he sent seventy-two fingerprint “lifts” to the Federal Bureau of Investigation in Washington, D.C., for analysis.
Ms. Jean Clements was recalled to testify, and she positively identified the Smith-Corona typewriter (seized during the search of Linda Silmon’s home) as the one she had sold to Mr. Harbin three weeks before he was killed.
Mrs. John Harbin was also recalled to testify, and she positively identified the binoculars which were taken during the search of Ms. Silmon’s home as the pair her husband kept in his car and used mainly for birdwatching. She stated she last saw the binoculars in his car around October of 1974 when she and her husband were traveling near Scottsboro, Alabama.
Agent Robert Hostick testified that he was a fingerprint specialist with the F. B. I. in Washington, D.C. Agent Hostick stated he made comparisons of the latent fingerprints that Officer Howell lifted from Mr. Harbin’s automobile with a set of inked prints belonging to the appellant. Agent Hostick testified that the results of his examination positively established that a latent fingerprint taken from the rearview mirror of Mr. Harbin’s automobile was made by the right index finger of the appellant.
James Kenneth Jackson testified that around October of 1974, his brother, Michael Jackson, requested that he do some bodywork on a 1968 Dodge Coronet. He stated that his brother’s wrecked car had three bullet holes in it, and that during the process of repairing the car he found the “lead part” of one bullet in the trunk. The witness further stated that he gave this bullet to his sister, Olivia White, as a souvenir.
Olivia White testified that she lived in Montevallo; she was the sister of Michael and James Jackson; and sometime “after Christmas,” James had given her a bullet which he had found while doing some repair work on Michael’s car. Ms. White stated that she kept this bullet in her purse until the early part of February at which time she turned it over to Sergeant Brooks of the Jefferson County Sheriff’s Department.
Sergeant Howard Brooks was recalled and testified that during his investigation of the instant homicide, he received information that the appellant had been involved in a shooting incident with one Michael Jackson and that a bullet which had been recovered from Jackson’s car was in the possession of Ms. Olivia White of Monteval-lo. Sergeant Brooks stated that he went to Montevallo, got the bullet from her, and turned the bullet over to Toxocologist Dr. Robert B. Johnson on February 7, 1975.
*591 Michael Jackson testified that on an October evening of 1974, he and his neighbor, Larry Silmon, were driving down 33rd Street in Birmingham when a car pulled in behind them and the passengers therein began firing pistols. He stated that he attempted to elude the gunshots by accelerating his car and making several turns which eventually caused him to lose control of his automobile in an alley near his home. Jackson testified that he and Silmon were able to get out of the wrecked automobile and escape on foot unharmed by their pursuers. Jackson stated he immediately reported this incident to the Birmingham Police Department and further testified that part of the damage to his car consisted of two bullet holes in the right side and one in the trunk. Jackson stated that about two weeks after this shooting incident, he took his car to his brother to be repaired.
Larry Silmon’s testimony was essentially the same as that of Michael Jackson, but Silmon, unlike Jackson, was able to identify two of the people who were shooting at them. Silmon stated that the car from which the shots were fired was a 1972 yellow Ford Ltd. and was being driven by Otis “Jig” Stevens. Silmon, who also knew the appellant, stated that the appellant was sitting in the back seat of the car and was firing a pistol from the rear (driver’s side) window. Silmon testified that when he and Jackson got out of their car and began to run, he saw the appellant alight from “Jig” Stevens’ car, armed gun in hand. Silmon concluded his testimony by stating that as they were running away, he recognized the appellant’s voice when appellant shouted, “There they go.”
Dr. Robert B. Johnson, a ballistics expert with the State Department of Toxicology, testified he made a comparison of the bullet taken from the skull of the victim with the one found in the trunk of Michael Jackson’s wrecked automobile. Dr. Johnson stated that in his opinion the two bullets “were fired from one and the same gun.” Dr. Johnson stated that the bullets were “jacketed” which indicated they were most likely used in an automatic pistol. He noted that the gun which fired the bullets “very characteristically marked them,” and further stated that the gun used had “six lands and grooves with a left hand twist.” The witness explained that there are only two manufacturers of guns which have that rifling description: One is a Colt 380; the other is a Llama 380. He further testified that “one land in the gun was so characteristic” that the marking it left on the two bullets made him absolutely certain that the bullets were fired by the same gun.
Sergeant Howard Brooks was recalled to the stand and testified that Otis “Jig” Stevens was arrested and placed in the Jefferson County Jail on November 26,1974. According to the testimony of James A. Hall, custodian of the Jefferson County Jail records (Birmingham Division), Stevens remained in the County Jail until January 13, 1975, and thus could not have possibly been involved in the John Harbin homicide.
The appellant’s motion to exclude for failure to make out a prima facie case was overruled.
The appellant’s first witness was Johnny Buford Silmon who had previously testified on behalf of the State. Silmon testified that he was with the appellant at his sister’s home during the time that Larry Sil-mon and Michael Jackson were allegedly fired upon while riding in Jackson’s automobile in October of 1974.
Linda Marie Silmon, also a prior State witness, testified that she had damaged her car in an accident in late November of 1974, had taken it to be repaired on the tenth of December, and had picked it up on December 14, 1974 — the weekend the appellant told her “he had messed up.”
Matilda Callins, a next door neighbor of appellant, testified that on a Friday during the mid-part of December, around 11:00 p. m., the appellant requested that she go pick up his girl friend (Linda Silmon) at work since Ms. Silmon’s car was in the shop being repaired. Ms. Callins stated she was unable to do so due to the fact that her car had no brakes.
After the defense rested, the State, in rebuttal, recalled Michael Jackson who tes *592 tified that the automobile shooting incident he was involved in along with Larry Silmon took place on a Saturday in September or October of 1974.
I
Appellant contends that the trial court erred in allowing into evidence a photograph which depicted the gunshot wound on victim’s face. He asserts that the photograph was gruesome, had no probative value, was merely cumulative, and, thus served no purpose but to inflame the passions of the jury. We disagree.
A photograph which sheds light upon the character and location of the wound on the body of a deceased is admissible even though it constitutes cumulative evidence upon a matter not disputed. Snow v. State, 50 Ala.App. 381, 279 So.2d 552, cert. denied 291 Ala. 798, 279 So.2d 558 (1973); Robinson v. State, Ala.Cr.App., 342 So.2d 1331 (1977); Douglas v. State, Ala.Cr.App., 333 So.2d 880, and cases therein cited.
II
The appellant next contends that the trial court erred in allowing Coroner Butler to give his opinion as to the caliber of the bullet which was removed from the deceased’s head.
Coroner Butler testified that during his experience as a Coroner, he has observed “hundreds” of gunshot wounds and the projectiles which inflicted them. He stated his duties as coroner have required him to gauge “on many occasions” the caliber size of projectiles. Qualifying questions propounded by the trial court further revealed that the witness was familiar with various kinds and sizes of guns and ammunition. The witness’ credibility to testify as an expert rested in the sound discretion of the trial court; we find no error. Cobb v. State, 50 Ala.App. 707, 282 So.2d 327 (1973); Hardy v. State, 53 Ala.App. 75, 297 So.2d 399 (1974); Payne v. State, 261 Ala. 397, 74 So.2d 630 (1954).
Ill
Following an extensive oral charge to which the appellant made no exception, the appellant requested that two written charges be given. The subject matter of both charges were fully and substantially covered in the trial court’s oral charge; thus, their refusals were proper. Title 7, Section 273, Code of Alabama 1940.
Beyond question, the State of Alabama presented a prima facie case, and after careful examination, we find the record free of error. We are of the opinion appellant received a fair and impartial trial, and the judgment is therefore to be and the same is hereby
AFFIRMED.
All the Judges concur.