Appellant was indicted for the February 9, 1980, murder of Pattie Bracken in violation of § 13A-6-2 Code of Alabama 1975 (Amended 1977). Trial was had with the jury finding him guilty as charged. Subsequent thereto, at appellant's sentencing hearing, the trial court fixed his punishment at fifteen years imprisonment. Throughout the trial and instant proceedings, appellant has been represented by court-appointed counsel.
We have thoroughly examined the state's evidence and found it to be sufficient to establish a prima facie case of murder.McCloud v. State, Ala.Cr.App., 401 So.2d 314 (1981); § 13A-6-2
(a)(1) Code of Alabama 1975 (Amended 1977). Only a brief narration of the facts is necessary.
On the morning of February 9, 1980, the victim went to the home of Matt Yancey to visit her grandchildren. Yancey rented a room of his house to appellant who was also present. Throughout the morning and early afternoon, the victim and appellant drank gin and wine. Neither argued with each other, although they teased each other about sexual matters. Apparently, the victim and appellant had shared the same bed.
Shortly before 3:30 p.m., appellant left the living room where he and the victim had been and went into the kitchen. He returned a few seconds later and while the victim was beginning to rise from her seat on the floor with her grandchildren, appellant thrust a large filet knife into her chest, cutting her aorta and heart. Within minutes of the stabbing, the Birmingham police arrived on the scene and took appellant into custody.
Appellant contends that a fatal variance exists between the indictment and proof in that the name of the victim was different from that recited in the indictment.
The indictment spelled the victim's name PATTIE BRACKEN, while her husband, during his cross-examination spelled it PATTIE BRACKENS. In addition, he identified the corpse taken from the Yancey home as his wife.
Matt Yancey, an eyewitness to the crime, testified that the victim had been living in his house for about one week and sleeping in the same room as appellant although she did not stay there the night before the stabbing. Appellant apparently knew the victim in more than a casual manner. *Page 304 
To be material, a variance as to the name alleged in the indictment from that proved by the evidence must be such as to be misleading or substantially injurious to the accused in making his defense, or to expose him to the danger of a second trial on the same charge. Rupert v. State, 45 Ala. App. 84,224 So.2d 921 (1969).
We find the above variance in the spelling of the victim's last name to be so trifling that it is inconceivable that appellant could have been misled or prejudiced thereby. Consequently, we find no error in the trial court's denial to dismiss the indictment and exclude the state's evidence on this ground.
Appellant asserts that the trial court erred in allowing Jefferson County Deputy Coroner Joe Canoy to testify as to the cause of death. He argues that Act No. 512, Alabama Acts 1977, p. 674, and Act No. 454, Alabama Acts 1979, p. 739, (hereinafter referred to as Acts 77-512 and 79-454, respectively) limit such testimony to only a licensed physician practicing medicine in Alabama. Appellant contends that Canoy was not a licensed physician and was not qualified under the above acts to give his opinion as to the cause of death.
Mr. Canoy testified that, at the time of the victim's autopsy, he had been employed in the Jefferson County Coroner-Medical Examiner Office for one and one-half years. He testified:
 "A. I have been to several homicide schools in the state of Florida. I was a homicide detective for 5 years. I received associate degree in criminal justice from the University of South Florida, B.S. Degree in criminal justice from University of Alabama. I'm presently working on a Masters in Forensic Science. I have attended forensic homicide investigation schools at the St. Louis School of Medicine.
. . . .
 "Q. Joe, have you had an occasion to view few or many bodies as alleged results by homicide?
"A. I have.
"Q. Few or many?
"A. Many.
 "Q. Had you had an occasion to observe few or many bodies that the homicide cause of death was by stab wound of a knife?
"A. Yes, sir, I have.
"Q. Few or many?
"A. Many.
 "Q. Do you have a judgment as to how many autopsies you have witnessed or been included on?
 "A. I imagine a rough guess probably 800 to 8,000, counting my pretraining and paramedics.
 "Q. And have you had training in causes of death and things like that, like about the heart and aorta and blood and hemorrhaging?
"A. Yes, sir, I have.
 "THE COURT: Let me ask you something. Eight hundred autopsies is an awful lot of autopsies to observe. I guess some of those — are most of them in Florida, or most up here, or less in Florida?
"THE WITNESS: Both.
"THE COURT: About even?
"THE WITNESS: Yes.
 "THE COURT: When you were a homicide detective in Florida, with a B.S. in the criminal justice system and Associate Degree and so on, most homicide detectives were not present. They are occasionally around here. How come you would be witness to so many autopsies in homicides?
 "THE WITNESS: In the state of Florida our DA wanted us to be there to testify in court, because a lot of times the pathologist cannot be there.
. . . .
 "Q. Did you testify in Florida courts as to cause of death in homicide cases?
"A. Yes, I have.
"Q. Few or many occasions?
"A. I would say many.
"Q. How about stab wound related?
"A. Stab wounds, yes, sir.
. . . . *Page 305 
 "Q. What do your duties entail or did entail at that time in your job as Deputy Coroner? Did you have a job description?
"A. Do I?
"Q. Did you at that time?
 "A. Yes, sir, it's written up in the Civil Service. It's a long paragraph. I don't remember what all it says. To assist with the pathologist in the autopsy and investigation of death.
. . . .
 "Q. Approximately how many stab wounds did you say you have seen? You said many. Can you give us a number?
 "A. I can't say, you know, how many. I would say many. I have seen as high as 43 stab wounds on one body."
Mr. Canoy testified that he was present during the autopsy of the victim and heard Jefferson County Coroner-Medical Examiner Dr. Ronald Rivers dictate his findings. He observed the external and internal wounds sustained by the victim. At the time of the trial, Dr. Rivers was employed as a chief medical examiner in Montana.
The record is clear that the autopsy was performed by a qualified physician, namely Dr. Rivers, consistent with Acts 77-512 and 79-454, respectively. Further, the autopsy report was apparently prepared from Dr. Rivers' dictation made at the time of the autopsy and of which Canoy had personal knowledge. The report bore the signature of Dr. Rivers. Canoy referred to the report during his examination to refresh his recollection.
We do not read Acts 77-512 and 79-454 to place upon the Coroner-Medical Examiner of Jefferson County the exclusive duty of expressing opinions as to the cause of one's death where such is investigated by his office. Both acts provide for the temporary replacement of the Coroner-Medical Examiner by one not licensed to practice medicine in Alabama. Act 77-512 subsection C; Act 79-454 § 3. Further, the Coroner-Medical Examiner is authorized "to conduct or have conducted an autopsy . . ." Act 77-512 subsection G; Act 79-454 § 9.
Nowhere in either act does it state that only the Coroner-Medical Examiner may testify as to the cause of death. Such is consistent with the established case law of this state. In Cobb v. State, 50 Ala. App. 707, 282 So.2d 327 (1973), we stated:
 "The general rule is that an expert witness' competence to testify is an inquiry substantially within the discretion of the trial judge. This Court on appeal will not disturb the trial judge's finding of expert qualifications vel non, unless there is a clear abuse of this discretion. King v. State, 266 Ala. 232, 95 So.2d 816 (1957).
 "Whether a witness can be covered with the expert veil depends on his acquired knowledge in a field of endeavor not ventured into by the layman. If that knowledge extends beyond or supersedes that of an ordinary witness, as determined by the trial judge, the witness can become an expert. In instances where testimony relating to cause of death is offered, the Alabama cases show that the testimony need not be given by a physician. By way of example, such persons can testify as to cause of death as a funeral director of twenty-five years experience, Cauley v. State, 33 Ala. App. 557, 36 So.2d 347, cert. den. 251 Ala. 163, 36 So.2d 354; a licensed embalmer and undertaker, Levert v. State, 34 Ala. App. 523, 42 So.2d 525, reversed 252 Ala. 308, 42 So.2d 532, cert. den. 252 Ala. 659, 42 So.2d 534; a chemistry professor, Scott v. State, 141 Ala. 1, 37 So. 357; an employee of the State Toxicologist's Department who was not a physician, Maund v. State, 254 Ala. 452, 48 So.2d 553; an undertaker and county coroner of many years experience, Williams v. State, 255 Ala. 229, 51 So.2d 250; a mortician, Thomas v. State, 249 Ala. 358, 31 So.2d 71; county coroner with background of two years of college and one year working under the employ of a pathologist, King v. State, supra, or a deputy county coroner with the requisite training and experience, Thigpen v. State, 50 Ala. App. 176, 277 So.2d 922; Willingham v. State, 50 Ala. App. 363, 279 So.2d 534, Snow v. State, 50 Ala. App. 381, 279 So.2d 552. *Page 306 
"It is shown by these cases that the mere fact that a witness is not a physician does not preclude his testimony as to cause of death. However, the fact that the witness is a coroner, mortician, professor, or toxicologist does not per se qualify him as an expert on causes of death. Phillips v. State, 248 Ala. 510, 28 So.2d 542. Rather, in these professions, the witness must be competent as shown by circumstances extrinsic to the fact of his profession, and not because of it. Such circumstances are the length of time the witness has been engaged in his profession, and the number of similar causes of death situations with which the witness has had experience. This simply indicates the rule that there is no presumption that a witness is competent to express an opinion."
See also Smith v. State, 282 Ala. 268, 210 So.2d 826 (1968);Robinson v. State, Ala.Cr.App., 362 So.2d 1290 (1978); St. Johnv. State, Ala.Cr.App., 358 So.2d 812 (1978); Carter v. State, Ala.Cr.App., 356 So.2d 682, cert. denied, Ala., 356 So.2d 689
(1978); Turk v. State, Ala.Cr.App., 347 So.2d 588, 592 (1977);Vaughn v. State, Ala.Cr.App., 347 So.2d 582 (1977); Campbell v.State, Ala.Cr.App., 341 So.2d 735 (1976), affirmed, Ala., 34341 So.2d 742 (1977); Lloyd v. State, Ala.Cr.App., 339 So.2d 1058, cert. denied, Ala., 339 So.2d 1062 (1976); Hunter v. State, Ala.Cr.App., 338 So.2d 513 (1976); Hoback v. State, Ala.Cr.App., 338 So.2d 439, cert. denied, Ala., 338 So.2d 444
(1976); Jones v. State, 53 Ala. App. 542, 302 So.2d 126 (1974);Hill v. State, 51 Ala. App. 515, 286 So.2d 924 (1973); Snow v.State, 50 Ala. App. 381, 279 So.2d 552, cert. denied, 291 Ala. 798, 279 So.2d 558 (1973); Thigpen v. State, 50 Ala. App. 176,277 So.2d 922 (1973).
It is not essential that the witness perform the autopsy himself for his opinion as to the cause of death to be admissible. The fact that Canoy used Dr. Rivers' autopsy report in conjunction with his own personal observations does not render his testimony inadmissible. Woodard v. State, Ala.Cr.App., 401 So.2d 300 (1981); Swanson v. State, Ala.Cr.App., 346 So.2d 1166 (1977).
Furthermore, in Smoot v. State, Ala.Cr.App., 381 So.2d 668
(1980), we held the Chief Medical Investigator of the Jefferson County Coroner-Medical Examiner's Office, a position created under the authority of Act 77-512, to be qualified to express his opinion as to the cause of death. See also Manigan v.State, Ala.Cr.App., 402 So.2d 1063, cert. denied, Ala.,402 So.2d 1072 (1981).
Based upon the foregoing authorities, we find appellant's contention without merit.
Appellant contends that the trial court erred in admitting a portion of his statement made at the scene shortly after the police had arrived.
Birmingham Police Officer Robert Hanslee testified that he and his partner arrived on the scene shortly after 3:30 p.m. in response to a police dispatch reporting an assault. He entered Yancey's living room and found the paramedics attending the victim. He stated that appellant, Yancey, and an unidentified black female were present. Officer Henslee testified that when he entered the living room he had no suspect in mind. He stated that he walked over to the paramedics, observed the victim, and asked, "What happened?" He testified that he did not direct the question to anyone in particular, but rather asked it in general. Appellant replied, "I stabbed her." Officer Henslee turned toward appellant and asked "Why," to which appellant replied in substance, "I felt like it."
Appellant argues that his second response should have been excluded because he was not given his Miranda warnings.
There can be no doubt that appellant's statements were voluntary exclamations, made prior to his being a suspect, in custody, or under arrest. Further, they were not the product of a custodial interrogation. The Miranda warnings have been found inapplicable in several similar situations. Truex v. State,282 Ala. 191, 210 So.2d 424 (1968); Sullivan v. State, Ala.Cr.App.,394 So.2d 76 (1981); Pope v. State, Ala.Cr.App., 387 So.2d 300
(1980); Cork v. State, 50 Ala. App. 670, 282 So.2d 107 (1973). *Page 307 
In Hall v. State, Ala.Cr.App., 399 So.2d 348, 351-52 (1981), this court, speaking through Judge Bookout, stated:
 "The Miranda rule clearly demands that the State may not use statements, whether inculpatory or exculpatory, stemming from a `custodial interrogation' of an accused unless it proves that the Miranda warnings were given to the accused prior to questioning. Extrajudicial confessions are prima facie involuntary and inadmissible, and the burden imposed upon the State is to prove that the accused `knowingly and intelligently waived his privilege against self-incrimination' to the satisfaction of the trial judge whose finding will not be disturbed on appeal unless it is contrary to the great weight of the evidence or is manifestly wrong.
 "`Custodial interrogation' is defined as `questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in any significant way.' Miranda, 384 U.S. at 444, 86 S.Ct. at 1612. `Interrogation' has been defined as `police questioning or conduct which is calculated to, expected to, or likely to evoke admissions.' . . . Such conduct need not occur at a police station or headquarters in order to be custodial.
 "The Miranda warning is required only where there has been such a restriction on a person's freedom as to render him `in custody.' . . . It is inapplicable to traditional investigatory functions as general on-the-scene questioning . . . The test in determining the existence of a custodial interrogation has been defined as whether a reasonable man would feel that he was physically deprived of his freedom of action in any significant way or is placed in a situation in which he reasonably believes that his freedom of action is restricted by such interrogation.
 "The line of demarcation between a general investigation and a custodial interrogation must be determined by a case-by-case factual analysis. . . . Criteria used to determine the necessity of Miranda
safeguards include: (1) probable cause to arrest, (2) subjective intent of the police, (3) subjective belief of the accused, and (4) focus of the investigation. While the focus of the investigation is especially important in deciding whether an accused should be given the Miranda warning, it is custody, and not focus which marks the point at which it becomes mandatory." (Footnote and citations omitted.)
At the time appellant made his second statement, he was not a suspect, in custody, or under arrest. Appellant was not subjected to a custodial interrogation as defined in Hall, supra. Officer Henslee's presence and purpose at the scene at the time appellant made his statements were for investigative rather than accusative reasons. While Officer Henslee may have directed his inquiry to appellant, focus alone does not trigger the necessity for informing one of the Miranda safeguards.Hall, supra; Sims v. State, 51 Ala. App. 183, 283 So.2d 635
(1973). Consequently, appellant's second statement reflects characteristics similar to that of his first statement.
We find the trial court properly admitted both of appellant's statements into evidence.
Appellant contends that the trial court erred in sustaining the state's objection to the admission of his statement made to Birmingham Police Sergeant Seldman Knight. He argues that it was admissible under the doctrine of curative admissibility and to establish the crime of manslaughter.
The state, in questioning Sergeant Seldman Knight, who investigated the instant crime and took the statement in question from appellant, asked him whether, in conjunction with his investigation, he had talked to any witnesses, to which he affirmatively replied. Without revealing what was said, Sergeant Knight stated that he talked to the police officers that went to the scene, Matt Yancey, and the appellant.
The doctrine of curative admissibility is applicable where a party who has introduced illegal evidence may have such rebutted by illegal evidence offered by his opponent. The doctrine is applicable even if the opponent failed to object to the original *Page 308 
illegal evidence. However, the doctrine limits admission of illegal rebuttal evidence only to the extent that it cures the effect of the original illegal admission. Hall v. State, Ala.Cr.App., 375 So.2d 536 (1979); Gamble, McElroy's AlabamaEvidence § 14.01 (3rd ed. 1977).
In the instant case, the doctrine of curative admissibility has no application as the state, through the testimony of Sergeant Knight, introduced no illegal evidence. Appellant's contention on this ground is without merit.
In addition, appellant argues that admission of the statement would have raised questions as to the intent element of his charge and thus established the lesser included offense of manslaughter.
The evidence adduced prior to the testimony of Sergeant Knight leaves no doubt as to appellant's intent at the time of the fatal stabbing. He admitted stabbing the victim and did so in the presence of an eyewitness. Furthermore, a close reading of the appellant's statement to Sergeant Knight inculpates him and establishes no defense to the crime. It does not establish any of the elements of manslaughter as defined in § 13A-6-3
Code of Alabama 1975 (Amended 1977). See also § 13A-6-2 (b), supra. In many respects, the statement is cumulative of evidence previously received. Consequently, appellant's contention on this ground is without merit. The trial court properly sustained the state's objection.
Lastly, appellant contends that the trial court confused and misled the jury in its oral charge concerning intoxication. He specifically challenged that portion where the trial court stated:
 "Mere drunkenness voluntarily produced is never a defense against a criminal charge and can never palpate (sic) or reduce the grade of the offense. We're talking about reducing the grade of the offense when you talk about the lack of intent to manslaughter."
A review of the trial court's complete charge on intoxication reveals that it correctly stated the law applicable to the facts. It substantially followed § 13A-3-2 Code of Alabama 1975 (Amended 1977). The above quoted portion of its charge fairly and substantially covered subsections (d) and (e)(2) of §13A-3-2.
It is a well settled proposition of law that, upon review of the trial court's instructions to the jury, the charge must be taken as a whole and portions challenged not isolated therefrom or taken out of context, but rather considered together. Lowmanv. State, Ala.Cr.App., 400 So.2d 430, cert. denied, Ala.,400 So.2d 434 (1981); Harris v. State, Ala.Cr.App., 394 So.2d 96
(1981); Stewart v. State, Ala.Cr.App., 381 So.2d 214 (1979), cert. denied, Ala., 381 So.2d 220 (1980); McCovery v. State, Ala.Cr.App., 365 So.2d 358 (1978). We find no error in the above portion of the trial court's oral charge either standing alone or when read in conjunction with the whole instruction concerning intoxication.
A careful search of the record reveals no error injuriously affecting the substantial rights of the appellant. The judgment of conviction is affirmed.
AFFIRMED.
All the Judges concur.