[EDITORS' NOTE: THIS PAGE CONTAINS HEADNOTES. HEADNOTES ARE NOT AN OFFICIAL PRODUCT OF THE COURT, THEREFORE THEY ARE NOT DISPLAYED.] *Page 1065 
First degree arson; life.
Birmingham Fireman Kenneth R. Goodwin testified that between 11:30 and 12:00 P.M., on February 24, 1979, he, along with other firemen in his company, answered a call for assistance at a duplex home located at 23-B 1st Place North in Birmingham. He stated one side of the house was well involved in fire with flames shooting from the front door and a window in the front room. Fireman Goodwin stated that the fire was extinguished in fifteen to twenty seconds, and after the smoke cleared, two bodies were discovered inside the house.
Goodwin testified that he had been employed as a fireman for twelve years and had fought hundreds of fires. He said that during the course of his employment, he had received training in identifying the origins and causes of fires. He testified that he knew the characteristics of a flammable liquid fire, which was identified by a specific char pattern in the fire-affected area.
Upon arriving at the scene, Goodwin noticed the front door to the house had been knocked open. He observed the condition of the padlock and hasp after the fire had been extinguished. He stated that the fire inspector was called due to the fire-related fatalities. Goodwin stated that a fire's point of origin is determined by the deepest char pattern left after extinguishing the fire. He testified that in a flammable liquid fire, the point of origin will have a deeper char pattern and as the liquid vaporizes, smaller, less deep char patterns will be found. According to Goodwin, there were two or three points of origin of the fire: in and around the front door; under a window in the front room; and in and around a bed in the middle room. He testified that based on his training, experience, and observation of the scene, the fire was started by a flammable liquid.
On cross-examination, Goodwin stated that he did not know if a time was determined when the fire started. He stated that he did not observe the condition of the back door but he did remember that one the two windows in the front room was shattered. He acknowledged that the broken window could have existed before the fire, and been caused by the water pressure of the hose, or resulted from the fire itself. Goodwin was present when the appellant identified one of the victims as his wife. He stated that the appellant was upset, screaming and, generally out of control.
Birmingham Fireman James Wint testified that he was a member of the second engine company to arrive at the scene. He stated that he found two bodies, one located in the front room on the couch and the second located in the middle room half-on and half-off the bed. Wint determined that both people were dead and stated that they were identified as the appellant's wife and Eula Hughes. Wint said that he did not observe a kerosene lamp on or around the front room mantel. Wint identified the same points of origin of the fire as those previously indicated by Fireman Goodwin. He also found another distinctive char pattern in the middle room on a wall above a dresser. He, too, gave his opinion that the fire was caused by a flammable liquid.
On cross-examination, Wint stated the "possible" point of origin was near the front door although he later clarified his answer and stated that the char pattern there was caused by the fire. He stated that there was no way to determine whether a char pattern found in the house existed prior to the fire. He said that he did not observe the back door but he noticed that all the windows in the house were broken. *Page 1066 
Birmingham Fire Marshall Howard Cooper testified that he was senior fire marshall and had been a fire inspector for seventeen years. He stated that the instant fire was reported at 11:43 P.M., on February 24, and that he arrived on the scene approximately fifteen minutes later. He made a preliminary examination to inspect the location of the bodies of the two victims. He stated that Eula Hughes was severely burned, while the defendant's wife suffered only minor burns. He observed the padlock and hasp on the front door and noted that the lock was not open and a portion of the hasp had been pulled out of the door facing. He stated that the nails which formerly attached the hasp to the door facing were not rusted. He noted the same three points of origin of the fire as those explained by Fireman Goodwin, but he testified that the front door area was the primary point of origin.
Cooper stated that a flammable liquid accelerates the growth of a fire and produces a quick heat. He testified that the bed had burned from the top downwards to the floor and the char patterns examined there were consistent with a fire caused by a flammable liquid. Cooper also stated that the house had no gas or electric services at the time of the fire. He said that he found the remains of a kerosene lamp near the mantel in the front room, although no charring of the wood was present in that area.
Cooper stated that his training and experience led him to suspect the use of an accelerant or flammable liquid in an area which is heavily charred but which contains nothing to ignite a fire. He explained that ordinarily the area around a front door is not a point of origin for a fire, because there is usually no material present in that area which would create a deep char pattern upon being ignited.
In a flammable liquid fire, according to Cooper, the char pattern will usually follow the flow of the flammable liquid upon the surface of whatever it was poured. Fire Marshall Cooper gave his opinion that a flammable liquid caused the instant fire.
On cross-examination, Cooper stated that the back door was open when he arrived at the scene and the slide bar lock was broken. He said that tests were preformed on a sample taken from the bottom threshold of the front door and from remnants of clothing found on the body of Eula Hughes in an attempt to determine the presence of a flammable liquid. The test results were negative. He stated, however, that such tests are inconclusive because it is possible for all the flammable liquid to be totally consumed in the fire.
Cooper stated that he was present when the appellant identified the body of his wife. He stated that appellant was restrained from entering the house for a period of time since the fire had not been completely extinguished and the house secured. He described the appellant as emotional and upset.
On redirect examination, Cooper testified that kerosene and gasoline are accelerants and are consumed prior to other materials such as wood. He stated that where there has been extensive burning, evidence of flammable liquids may not be found.
Birmingham fireman, Captain J.H. McQueen, testified that he was a member of the second company that arrived upon the scene. He went to the back door and, finding it locked from the inside, pushed it open with his shoulder. He entered the kitchen and proceeded to the middle room, finding no fire in either. McQueen inspected the damage to the house and said that in his opinion the fire was caused by a flammable liquid.
Chief medical investigator Jay Glass of the Jefferson County Coroner-Medical Examiner's Office testified that he assisted in the autopsies of the appellant's wife and Eula Hughes. He testified that the cause of death for both women was asphyxia due to carbon monoxide poisoning. He stated blood samples from each body were extracted and tested for alcohol content. The results indicated that both women had a .28 blood alcohol level.
Glass testified that the presence of alcohol in the system would result in lowering *Page 1067 
the amount of carbon monoxide one would need to inhale before losing consciousness.
On cross-examination, Glass stated that only tests for blood alcohol and carbon monoxide levels were performed, and in his opinion, the women were intoxicated at the time of death.
Mrs. Leona Hamilton, the mother of appellant's wife, stated that the house that burned was her residence and she had rented it for about eight years. Her daughter and the appellant had lived there with her for about a year. On the night of the fire, however, Mrs. Hamilton spent the night with friends. She testified that she never had a lock on the front door.
Eddie Davis testified that between 5:00 and 6:00 P.M., on February 24, he was at appellant's residence with appellant's wife. Mr. Davis stated that he and Mrs. Manigan were sitting in the front room talking when appellant entered the house. He testified that both he and Mrs. Manigan were clothed. Mr. Davis said that, upon entering, the appellant said, "What in the hell is going on in here?" Appellant told Davis that he was "going to whip your so and so," and said to his wife, "Bitch, I am going to kill you if it is the last thing I do." Davis and the appellant began to fight and appellant hit Davis with an object and cut his head. Davis stated that he fell off the front porch, and after the fight had ended, walked home. Later in the evening Davis was treated at Cooper Green Hospital for his injuries sustained in the fight. Davis testified that when he was walking away from appellant's residence it was the last time he saw Mrs. Manigan alive.
On cross-examination, Davis stated that he was sitting in a chair and Mrs. Manigan was lying on the sofa when they were talking. He said that he had not been drinking and, as far as he knew, neither had Mrs. Manigan. Davis testified that he remembered having a conversation with Birmingham Police Sgt. F.M. Knight on February 27, 1979, around 2:51 P.M., at his house. He stated that he did not remember telling Sgt. Knight that Mrs. Manigan had her clothes "down." Davis testified that he did not have sex with Mrs. Manigan on February 24, and denied telling Sgt. Knight on February 27 that he had. He stated he told Sgt. Knight that he had been "going" with Mrs. Manigan at the time of the fire. Davis testified that he had had sexual relations with Mrs. Manigan in the past, but not on February 24.
On redirect examination, Mr. Davis testified that he did not see the defendant hit Mrs. Manigan.
Walter Miles, who lived two blocks from the scene of the fire, stated that the appellant visited him twice on the day of the fire. Mr. Miles testified that, "Around about eleven something" the appellant came to him and asked to borrow a lock. Miles stated that he was making coffee at the time and he went into the kitchen to attend to it when the appellant made his request. He told the appellant he did not have an extra lock and the appellant left. Miles testified that he kept the lock for his front door on the mantel when he was not using it, and that the appellant had been standing next to the mantel while they had been talking.
Miles stated that approximately thirty minutes later the appellant returned to his house and told him, "Well, I locked the house. I'm headed up to Minnifield's now." Miles stated that the appellant told him that his sister had picked up his wife and taken her to West End. Miles testified that the defendant told him that he needed a lock because he had "some things" in the house although he did not say what. Miles testified that when he later left his house to go to the scene of the fire he looked for the front door lock but could not find it. He stated that it was there before the appellant came to his house the first time.
Eddie Lee Gosha testified that he knew the appellant and remembered the evening of the fire. He stated that on February 24 between 10:00 and 11:00 P.M., he saw the appellant about two and one-half blocks from the scene of the fire carrying an axe. Gosha testified that he told the defendant that if the police caught him with the axe they would "tear his head up." Appellant *Page 1068 
replied that he was going to kill him a "m_____ f_____." Gosha testified that during the two to five minutes that he talked to the appellant, a car drove by and as it did, the appellant threw the axe down to the ground only to pick it up after the car had passed.
Mary Rose Polion testified that she lived in the neighborhood where the fire occurred. She stated that prior to the fire she would go visit Mrs. Hamilton, appellant's mother-in-law, and care for her since Mrs. Hamilton was blind. Mrs. Polion testified that she never knew the front door to be locked.
The day after the fire, Mrs. Polion had a conversation with the appellant concerning the fire. She asked the appellant why he had locked the women in the house, to which he replied that he was trying to protect his radio and his sleeping wife. Mrs. Polion testified that the appellant told her that he knew Mrs. Hughes was not asleep because he had given her a cigarette and then lit it for her.
Birmingham Fireman Kenneth R. Goodwin was recalled and testified that on February 24, around 6:00 P.M., he treated Eddie Davis for several bruises and cuts on his head.
Detective Sgt. Selman Knight of the Birmingham Police Department's homicide division testified that he investigated the deaths of the two women killed in the fire. Outside the presence of the jury, Sgt. Knight testified that he had talked to appellant on two occasions, February 28 and March 2. He stated that at both times, the appellant was not in custody and the conversations were taped. Knight said both conversations occurred at City Hall. He stated that no promise, hope of reward, threat or inducement was made to the appellant to make a statement. Sgt. Knight testified that appellant's Miranda
warnings were read and explained to him. He testified that accurate transcriptions of the taped statements were prepared.
On cross-examination, Knight testified that appellant was arrested on March 2, approximately twenty-three minutes after completing his statement.
The trial court overruled the appellant's general objections to the statements and, after excising certain inadmissible portions, admitted them into evidence.
After the jury was recalled, Sgt. Knight repeated the above testimony and read the statements to the jury. In the February 28 statement, the appellant stated, in pertinent part, that he did not set the house on fire. He said that he found his wife partially naked with Eddie Davis. He then threw his wife out of the house and shortly thereafter helped her into the house and to the bed. A short while later he went to get some cigarettes. During his trip, he stopped at Walter Miles' house to inquire about a lock. Upon returning and locking the door he saw Eula Hughes in an alley close to the house and escorted her back to the house. He unlocked the house, let her in, lit a kerosene lamp on the mantel, and gave her a cigarette. The appellant stated that he then relocked the door and returned to Mr. Miles' house. The appellant said that Mr. Miles had an extra lock and gave him one with the key. The appellant stated that he locked the door to protect his radio and his wife who was naked in the bed and, apparently, asleep. He stated that he went to Ola Mae Hall's house, had about three drinks of whiskey, and remained there until after midnight.
The appellant said that they used kerosene lamps to light the house and he had last purchased kerosene about three or four days before the fire. He stated that the lamp in the front room contained all the kerosene in the house at the time of the fire. He denied lighting a cigarette for Eula Hughes and stated that he thought the fire was caused by Mrs. Hughes' breaking the kerosene lamp while attempting to light her cigarette. The appellant denied threatening his wife or Eddie Davis after finding them together. The appellant said that they kept firewood in the house and that he cut it with his axe, but he had not seen the axe since the fire. He denied telling anyone that he was going to kill his wife or anybody. *Page 1069 
In the March 2 statement the appellant recalled the details of the February 24 fight with Eddie Davis. He said someone had told him that Mr. Davis was having sexual relations with his wife. He said that he owned an axe but did not know where it was after the fire and did not borrow one from Walter Miles. He stated that he had been carrying an axe in the alley near his residence the evening of the fire when he met a friend, Eddie Lee Gosha. He denied telling Gosha or anyone else that he was going to kill someone. He stated that he had removed the axe from his house prior to locking the front door. He then set the axe by the fence in the alley when he saw the fire trucks at his house.
On cross-examination, Sgt. Knight stated that on March 2, the appellant had been drinking but was not drunk when the statement was made. He also testified that on February 27 he and Sgt. W.D. King took a statement from Eddie Davis at his home wherein Mr. Davis said he had sex with Mrs. Manigan on February 24.
The State recalled Birmingham Fire Marshall Cooper for the purpose of testifying to certain statements made by the appellant at the scene of the fire. Cooper testified, out of the presence of the jury, that on February 25 around 12:30 A.M., he talked to the appellant outside the burned house. It was raining lightly and they got into a nearby police car. At the time he talked to the appellant he had not formed an opinion about the origin of the fire and he was attempting to get assistance from the appellant in order to determine what occurred at the house and what may have caused the fire. Cooper stated it is standard procedure to talk to the residents of a burned building. He testified that the appellant was not under arrest at the time they talked, was not a suspect, and voluntarily came to the scene without force or coercion.
On cross-examination, Cooper testified that he investigates a fire if, in addition to other reasons, a death or injury occurs or the fire is "suspicious in nature." He stated that at the time he talked to the appellant he had entered the house and had viewed the two victims, but had not reached a conclusion about the cause of the fire. He stated that anyone who had anything to do with the house could have been considered a suspect since the cause of the fire had not yet been determined. Fire Marshall Cooper stated the he sat on the front seat of the police car and the appellant sat on the back seat.
On redirect examination, Fire Marshall Cooper stated that the reason for getting into the car was to get out of the rain. He said that the following day he saw the appellant at the house but he was not in custody. Cooper testified that he offered the defendant no hope, promise, reward, or inducement to talk to him and did not threaten, coerce, or intimidate him.
The trial court ruled the statements by the appellant to Fire Marshall Cooper were admissible.
After the jury was recalled, Cooper repeated the pertinent portions of his earlier testimony and recalled the conversation he had had with the appellant. Appellant told him that there was no gas or electric service in the house, no fire in the fireplace, and no heater on the middle room. The appellant told him that one kerosene lamp on the front mantel was lit when he left. The appellant did not knew what time he had padlocked the front door and left. After Cooper's inquiry, the appellant left the scene and returned approximately twenty minutes later with a key to the padlock. The appellant told Cooper the location of his wife and Mrs. Hughes when he had left and stated that he gave Mrs. Hughes a cigarette and lit it. The appellant told him that he thought the fire could have been started by Mrs. Hughes' cigarette. Cooper testified that the appellant stated that after leaving the house he went to a service station to buy some cigarettes and afterwards went to Mrs. Hall's.
Mrs. Ola Mae Hall testified that on February 24, the appellant inquired whether he could borrow a lock. Mrs. Hall told him that she did not have an extra lock. The next time she saw him was when the police brought him to her house to stay while the *Page 1070 
fire was extinguished and bodies removed. After Mrs. Hall's testimony the State rested, and the defense moved to exclude the State's evidence for failure to prove a prima facie case.
Appellant took the stand and testified that he came home during the afternoon of February 24 and, in response to his knock on the front door, heard someone say, "Here us are down here." The appellant entered the house and found his partially naked wife with Eddie Davis on the floor of the front room. He said his wife was drunk. A fight ensued between Eddie Davis and the appellant. Around 8:00 P.M. he left the house and went to Walter Miles' to inquire about borrowing a lock. He stated that Mr. Miles gave him a lock and thereafter he returned to his house, locked it with his wife inside, and left. He met Eula Hughes in an alley near his house, and, with Mrs. Hughes, returned to the house, unlocked it, let her in, relocked it, and they went to Mrs. Hall's house. He stayed there until midnight and then went home. The appellant stated that he locked the front door because of the condition of his wife. He said the back door was locked from the inside. He denied starting the fire.
On cross-examination, the defendant admitted having been convicted in four burglary and grand larceny trials and two buying, receiving, concealing stolen property trials. He stated that during the day he had drunk three beers and split a half pint of whiskey beginning around 9:00 A.M.
Appellant testified to the details of this fight with Eddie Davis and stated that he threw his wife into the front yard although he did not hit her. After the fight, he carried her to the bed. He stated that he slapped his wife only to awaken her. Appellant told Davis that if he caught him again with his wife he would kill him, but denied making a similar threat to his wife.
When he went to Walter Miles' house around 8:00 P.M., to borrow a lock, he told Miles that no one was at his house, that his wife was with his sister in West End, and that he would return the lock the next day. Appellant said he told Miles that so that Miles would give him a lock. He stated that he always kept the back door locked and he checked it that evening.
The appellant testified to meeting Eula Hughes in the alley and letting her in the house. After initially denying that he lit Mrs. Hughes' cigarette, he then admitted lighting it and lying to the police. He denied going anywhere except to Mrs. Hall's after he left his house and admitted telling Eddie Lee Gosha that he was going to kill someone, although he stated that he did not mean it.
The appellant stated that he did not know why he had the axe with him when he met Gosha. He acknowledged that he had the key to the lock with him when he talked to Fire Marshall Cooper and did not have to go to Miles to get it.
 I The appellant challenges the sufficiency of the State's evidence and maintains that the totality of the circumstances did not warrant a conviction.
The State's case is predominantly based upon circumstantial evidence. In Cumbo v. State, Ala.Cr.App., 368 So.2d 871, cert. den. Ala., 368 So.2d 877 (1979), we stated:
 "In reviewing a conviction based on circumstantial evidence, this court must view that evidence in the light most favorable to the prosecution. The test to be applied is whether the jury might reasonably find that the evidence excluded every reasonable hypothesis except that of guilt; not whether such evidence excludes every reasonable hypothesis but guilt, but whether a jury might reasonably so conclude." [Citations omitted]
It is our duty upon appeal to determine whether any theory of the evidence exists from which the trier of fact could have excluded every hypothesis except guilt beyond a reasonable doubt.
After a careful review of the evidence, we find that the trial court did not err in overruling the appellant's motion to exclude the State's evidence. The evidence *Page 1071 
presented was sufficient for the jury to reasonably infer that the appellant committed the crime.
 II
Appellant contends that the trial court erred in admitting his statements to Fire Marshall Cooper on the ground he was not given his Miranda warnings.
The trial court had before it the following facts elicited on voir dire examination from Fire Marshall Cooper: (1) Cooper had not determined the cause and origin of the fire when he talked to the appellant, (2) he was not investigating the cause of the fire when he talked to the appellant, but had only viewed the location of the victims' bodies, (3) his purpose in talking to the appellant was to get assistance from him to aid in determining what happened, (4) an interview with residents of burned buildings was a standard procedure, (5) the interview took place in the police car only because it was raining outside, (6) the appellant was not a suspect at the time Cooper talked with him, and, (7) appellant was not under arrest at the time of their conversation.
It is clear that the appellant was not subjected to a custodial interrogation when he conversed with Fire Marshall Cooper. The questioning was investigative rather than accusative, and no inquiry had focused on appellant. Consequently, the constitutional guarantee espoused in Mirandav. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), did not attach. Escobedo v. Illinois, 378 U.S. 478,84 S.Ct. 1758, 12 L.Ed.2d 977 (1964); Kelley v. State, Ala.Cr.App.,366 So.2d 1145 (1979); Reno v. State, Ala.Cr.App., 377 So.2d 122
(1976).
 III
Appellant also insists that the trial court erred in admitting his February 28 and March 2 statements to Sgt. Knight. On appeal, he assigns as error the ground that the statements were involuntary and without the benefit of the procedures outlined in Miranda, supra. Appellant also asserts that the February 28 statement should not have been admitted because Sgt. Knight knew the contents of appellant's conversation with Fire Marshall Cooper.
We note that appellant did not raise the latter ground at trial, but raised it initially on appeal. We will therefore limit our discussion to the ground of objection raised at trial and ruled upon by the trial court as he is bound by the objection stated at trial. Franklin v. State, Ala.Cr.App.,357 So.2d 364, cert. den. Ala., 357 So. 368 (1978). At trial, he made only a general objection to the admission of both statements, though we consider the general objection to raise the questions of voluntariness and the proper Miranda warnings being given.
The record indicates that the proper voluntariness predicate was laid, and Miranda warnings given, respectively, on both occasions. It further illustrates that the appellant was not in custody at the time of either statement and that both are noninculpatory in nature. See Glover v. State, Ala.Cr.App.,347 So.2d 592 (1977); Oatsvall v. State, 57 Ala. App. 240,327 So.2d 735 (1975), cert. den. 295 Ala. 414, 327 So.2d 740 (1976).
Whether a confession is voluntary is a question for the trial judge to determine. Harris v. State, 280 Ala. 468,195 So.2d 521 (1967). He need only be convinced by a preponderance of the evidence that it was voluntarily made. Lego v. Twomey,404 U.S. 477, 92 S.Ct. 619, 30 L.Ed.2d 618 (1972); Baldwin v. State, Ala.Cr.App., 372 So.2d 26, affirmed, Ala., 372 So.2d 32 (1978).
The evidence presented by Sgt. Knight was sufficient to support the trial court's ruling that the appellant's statements were voluntarily made. Consequently, the trial court properly admitted the statements into evidence.
 IV
The appellant complains that the State in its closing argument improperly drew an "inference from another inference," in violation of the rule set out in Gamble, McElroy's AlabamaEvidence, § 21.01 (8) (3d ed. 1977). *Page 1072 
We quote the pertinent portion of the State's closing argument:
 "MR. BLACK: What they wanted to do in this instance was what he knew and what he would say, because he wasn't giving an opinion, he was giving facts.
 "He said facts, and he told two people, the firemen and Mrs. Polion, told them both, said, `Before I left, I lit that lady's cigarette.'
 "That's a fact. That is not an opinion. He is saying that as a fact, and, then, he turned right around and he told the police, as soon as he thinks, `Well, it would sound better if I made it sound like she could have set that fire by knocking that lamp off the shelf. So, if I had already lit the cigarette for her, then she wouldn't have any reason —.
"MR. FUHRMEISTER: We object to what he thought.
 "THE COURT: Overrule. He may draw inferences." [Emphasis added]
A review of the testimony of both Mrs. Polion and Fire Marshall Cooper reveals that the appellant told both witnesses that he had lit Mrs. Hughes's cigarette. In addition, during his cross-examination, appellant reluctantly admitted telling Fire Marshall Cooper that he had done the same. He further admitted that he had lied to Sgt. Knight when he told him that he had not lit the cigarette. Therefore, whether or not appellant lit the cigarette for Mrs. Hughes was not an inference, as appellant suggests, but a matter of disputed fact which the jury had to resolve. The inference of guilt, if any, arose from the fact that appellant made inconsistent statements, not from the truth or falsity of the matter contained in the statements.
To constitute reversible error, the statement of counsel in argument must be made as a fact which is unsupported by any
evidence, and the argument must be pertinent to the issues at trial or its natural tendency must be to influence the finding of the jury. Flint v. State, Ala.Cr.App., 370 So.2d 332 (1979);Jordan v. State, 40 Ala. App. 693, 122 So.2d 45 (1960). Counsel for both the State and defendant are allowed wide latitude in drawing reasonable inferences from the evidence in their closing arguments. Hope v. State, Ala.Cr.App., 378 So.2d 745, cert. den. Ala., 378 So.2d 747 (1979); Brown v. State, Ala.Cr.App., 374 So.2d 391, affirmed Ala., 374 So.2d 395
(1979). A prosecutor as well as defense counsel has a right to present his impressions from the evidence, if reasonable, and may argue every legitimate inference. Williams v. State, Ala.Cr.App., 377 So.2d 634, cert. den. Ala., 377 So.2d 639
(1979); Borden v. State, Ala.Cr.App., 337 So.2d 1388 (1976).
Clearly, there were facts in evidence from which the assistant district attorney could have drawn the inference that appellant's inconsistent statements reflected his guilt. The State's closing argument was not a violation of the rule stated in § 21.01 (8) of Gamble, McElroy's Alabama Evidence (3rd ed. 1977), and we find no error in the trial court's ruling.
We have searched the record for error and finding none, the judgment of conviction by the Jefferson Circuit Court is affirmed.
AFFIRMED.
All the Judges concur.